UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| SHIRLEY WILLIAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 03-2200-JWL |
| | ) |
| SPRINT/UNITED MANAGEMENT COMPANY, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION TO COMPEL
REGARDING ADVERSE IMPACT ANALYSES**

**I.    Nature of the Matter; Background Facts.**

As this Court knows, Shirley Williams claims her age played a determinative role in her deselection and termination from employment with Sprint during a so-called reduction in force ("RIF"). She seeks to proceed on behalf of herself and others similarly situated with an age discrimination action against Sprint. The Reduction in Force impacted Ms. Williams, and others similarly situated to her, during a time frame spanning at least October 2001 through March 31, 2003.

On December 23, 2003, plaintiffs served Plaintiffs' Third Request for Production of Documents.[1] The definition of document includes not only all "writings," but also "e-mails, studies, analyses, and other data compilations (electronic or otherwise) from which information can be obtained . . . ." As set forth in Plaintiffs' Motion to Compel, Document Requests 1 - 4 request documents or other data in connection with any impact analyses performed during the calendar years 2001 and 2002. Defendant objected on the basis of attorney-client and work-product privileges, and

---

[1] Plaintiffs also served on 12/23/03 their "Second Interrogatories." Sprint's responses and objections thereto are not the subject of this Motion to Compel.

no new Privilege Log was filed by defendant in connection with documents and data withheld. Counsel therefore assumes (for purpose of this Motion) that the Privilege Log completed by defendant November 26, 2003 — which has two (2) entries falling within the ambit of plaintiffs' requests — describes all withheld impact analyses and data for the years 2001 and 2002, inasmuch as no privilege log has been filed seeking to exempt them from discovery.

Plaintiffs do not know if any impact analyses was performed with request to "transfers." And Sprint's first (and only) Privilege Log provides no help in identifying potentially applicable documents and data. But because such requested data is germane and discoverable, plaintiffs file this timely Motion to Compel full and complete responses, if any impact analyses exist as to "transfers" occurring in 2001 and 2002.

As set forth in Plaintiffs' Certificate of Compliance, in a telephone conversation on January 13, 2003, the subject of Impact Analyses was thoroughly discussed, and Sprint stated that it would maintain its objection to producing Adverse Impact Analyses. Dennis Egan wrote Yates on February 12, 2004 to make sure every effort had been exhausted to meet and confer on this dispute short of a Motion. Mr. Egan has not heard anything from Mr. Yates in response to the February 12, 2004 letter. Apparently, the parties both agree that discoverability must be resolved by the Court.

James Kissinger, testifying for Sprint under Rule 30(b)(6) admitted that Adverse Impact Analyses had been conducted in connection with the RIF(s) at issue. (Tr. 165-171). Kissinger could not answer precisely when, and for how many of the RIF announcements impact analyses were conducted. (Tr. 166-167).

A document entitled, "**Displacement Guidelines**" was marked in Kissinger's deposition as

Exhibit 8.[2] (Attached). At page 35 (attached) of his deposition, Kissinger testified:

> Q. Now, these guidelines or procedures for selecting employees for reductions in a RIF, are they mandatory.
> A. This is the guidance that we set for a reduction-in-force and the selection process related to that. These steps are to be followed, yes.
> Q. Are they mandatory?
> A. This the guides – these are the guidelines that we follow in selecting the process.
> Q. **Are they mandatory? Is it mandatory that they be followed?**
> A. **Yes**.

(Kissinger Depo. of 12/18/03, p. 35).

Toward the bottom of the **DISPLACEMENT GUIDELINES** this directive is given:

> "Review planned displacement action with the Law Department and Corporate Employee Relations in advance for disparate impact analysis."

The "NOTE" at the very bottom directs in capital letters:

> **NOTE**: DOCUMENT AND RETAIN THE INFORMATION USED TO MAKE THE RETENTION DECISION.

At page 170-171 of his deposition, Mr. Kissinger contradicts the plain language of the "mandatory" Displacement Guidelines regarding whether it was routine that "planned displacement actions" were supposed to be reviewed "with the Law Department and Corporate Employee Relations <u>in</u> <u>advance</u> for disparate impact analysis." (Ex. "F," underline added). He testified that his Corporate Employee Relations group would discuss planned reductions within that department and then discuss with the law department whether or not they want HR to conduct an Adverse Impact Analysis. (Tr. 171). After Mr. Klamann asked if the witness would be instructed not to answer or

---

[2] It also was attached by Sprint as Exhibit F to its recent brief, filed February 2, 2004, and is attached hereto.

3

disclose the adverse impact analysis results, Klamann asked Mr. Yates if he could "assume that you're not going to be offering that at trial? Should I assume that?" (Tr. 172). Mr. Yates would not say whether Sprint would attempt to use impact analyses results at trial or not. When pressed by Mr. Klamann, Mr. Yates merely stated: "I'm not withdrawing the instruction. Like I said, John, you can draw whatever assumption you want from that. We both understand the consequences of that objection." (Kissinger Depo., at 172).

Mr. Klamann continued his questioning regarding <u>when</u> adverse impact analyses are done in connection with reductions, leading to Mr. Kissinger's answer that:

> "[I]n some reductions an adverse impact analysis is requested and conducted at the direction of the law department before the RIF is actually implemented. That's what this says, in advance, and others, we do not have an adverse impact analysis. It's not routine. It's not for every reduction in force."

(Kissinger Depo., 174-175). Kissinger said, "I don't know how to answer" the question of "which RIFs had a disparate impact analysis performed . . . in advance of the RIF." (Tr. 175). He also testified "I don't know the answer" to whether Adverse Impact Analyses were performed as to age discrimination. (176).

## QUESTIONS PRESENTED

1. Has Sprint adequately shown that adverse impact analyses constitute attorney-client privileged communications by showing that they communicate legal advice? Even if they do, should all factual data and results comprising any and all such adverse impact analyses be produced to plaintiff without including lawyer advice and/or mental impressions?

2. Does work product protect disclosure of documents and data when it is undisputed that no particular legal action was even pending when the impact analyses were generated?

**ARGUMENT**

1. **Attorney-Client Privilege.**

Sprint, the party asserting objections based on work-product immunity and attorney-client privilege, bears the burden of establishing that either or both apply. **_McCoo v. Denny's, Inc._**, 192 F.R.D. 675, 680 (D. Kan. 2000) (citing **_Boyer v. Bd. of County Comm'rs_**, 162 F.R.D. 687, 688 (D. Kan. 1995); **_Ali v. Douglas Cable Comm., Limited Partnership_**, 890 F.Supp. 993, 994 (D. Kan. 1995)). Defendant must make a "clear showing" that the asserted objection applies. Id. To carry that burden, Sprint must "describe in detail" the document or information sought to be protected and provide precise reasons for the objection to discovery. **_McCoo_**, 192 F.R.D. at 680. Defendant additionally should provide sufficient information to enable the Court to determine whether each element of the asserted objection is satisfied.

**_Motley v. Marathon Oil Company_**, 71 F.3d 1547 (10th Cir. 1995) is the only 10th Circuit opinion plaintiffs found that discusses the attorney-client privilege in the context of employment litigation arising out of a reduction in force. In **_Motley_**, a document contained in the company's Privilege Log was described as "a draft of a May 21, 1992, Memo from the Law Department on proposed guidelines for implementation of involuntary terminations." Id. at 1550. Another was described as "Lists prepared at the request of John Miller, attorney, which he used to advise the [ROC]."[3] Notably, attorney Miller's deposition was taken, and the district court determined after *in camera* review that the documents were privileged. The Tenth Circuit held in conclusory fashion (that doesn't shed much light here) as follows:

> We cannot say that the district court abused its discretion in concluding that the communications in issue were for the purpose of providing legal rather than business advice.

---

[3] "ROC" stands for "restructuring oversight committee."

5

Id. at 1551.

The Tenth Circuit acknowledged the rule applicable here, "that the mere fact that an attorney was involved in the communication does not automatically render the communication subject to the attorney-client privilege." Id. at 1550-51. Miller had stated by affidavit that the draft memorandum "contained legal advice for the corporate restructuring of Marathon." Id. at 1551. The attorney attested that lists in question were "prepared for his use in giving legal advice to the Restructuring Oversight Committee." He testified in deposition that he served in the capacity as legal adviser to the Restructuring Committee. The Court simply did not find the district court abused its discretion. Here, we know nothing about whether "advice" is entwined in the analysis — due to the imprecision of the Privilege Log, imprecision of Kissinger's testimony, and instructions to Kissinger not to answer questions.

Plaintiffs submit that a careful reading of *Motley* reveals that it is not any kind of impediment for discovery of the underlying **factual** "results" of the Impact Analyses. This Court has many times observed that the focal point of the attorney-client privilege lies with "communications" between attorneys and their clients. ***Upjohn v. United States***, 449 U.S. 383, 395-96, 101 S.Ct. 677, 685-86 (1981). The attorney-client privilege does not protect the disclosure of the underlying facts by those who communicated with the attorney. Id. Accord: ***Burton v. R. J. Reynolds Tobacco Co.***, 175 F.R.D. 321, 327 (D. Kan. 1997). In ***IMC Chemicals, Inc. v. Niro, Inc.***, No. 98-2348-JTM, 2000 WL 1466495, at * 8-9 (D. Kan. 2000), the Court states:

> The protection of the privilege extends only to *communications* and not to facts. A fact is one thing, and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant facts within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.

Accordingly, if relevant facts are incorporated into an otherwise attorney-client privileged document, the document still is subject to disclosure after redaction of the privileged material. ***Burton v. R. J. Reynolds Tobacco Co.***, 177 F.R.D. 491, 499-500 (D. Kan. 1997). A party cannot shield documents and/or facts from disclosure by combining them, or interlacing them with privileged material; non-privileged underlying factual information <u>must</u> be disclosed and the log must be specific enough for the Court and the opposing party to determine into which category the information falls. Here, plaintiffs submit that the Privilege Log does not allow the Court to determine, without *in camera* review, whether adverse impact analyses even fit the attorney-client privilege by being a "communication" for legal advice.

There are numerous subjects on the defendant's Privilege Log which, in contrast to the two <u>entries</u> covering RIF impact analyses, clearly do involve mental impressions of counsel on a variety of legal issues. Plaintiffs have <u>no</u> interest whatsoever in trying to pierce the attorney-client privilege or work-product privilege with respect to legitimately "privileged" communications. But defendant has given plaintiffs inadequate disclosure to allow plaintiffs to intelligently determine whether there is underlying factual data that can and should be <u>separated</u> from mental impressions and legal advice.

Plaintiffs should be allowed to take the deposition of a designated representative to describe, in sufficient detail, the Impact Analyses, how they were used, what the data compilations show, etc. Also, this Court probably will need to review the documents and data at issue to determine if plaintiffs are able to extract factual information without violating the privilege.[4]

---

[4] See ***Evans v. Atwood***, 177 F.R.D. 1 (D. D.C. 1997), an age case, where the Court held that, to the extent an attorney plays an important role in planning or designing a RIF, he or she may become a fact witness whose depositions can be compelled.

## 2. **Work Product Protection.**

To establish work product protection, a party must show that (1) the materials sought to be protected are documents or tangible things; (2) they were prepared in anticipation of litigation or for trial; and (3) they were prepared by or for a party or a representative of that party. ***Johnson v. Gmeinder***, 191 F.R.D. 638, 643 (D. Kan. 2000). It is not enough that defendant claims documents are linked to some vague possibility of litigation. Instead, documents must be "linked to some particular anticipated litigation." As stated in ***RJR v. Burton***:

> Even if there is a general prospect of litigation, a document is not protected by work-product immunity if the document was prepared merely in the regular course of business . . . . Materials assembled in the ordinary course of business . . . or for other nonlitigation purposes are not qualified under the qualified immunity provided by this subdivision.

Fed. R. Civ. P. 26(b)(3) Advisory Committee Note. This Court has stated agreement with the following principle enunciated by the Fourth Circuit:

> We take note of the fact that members of society tend to document transactions and occurrences to avoid the foibles of memory and to perpetuate evidence for the resolution of future disputes. And because litigation is an ever present possibility in American life, it is more often the case than not that events are documented with the general possibility of litigation in mind. Yet, the mere fact that litigation does eventually ensue does not, by itself, cloak materials with work product immunity.

***National Union Fire Insurance Company v. Murray Sheet Metal Co.***, 967 F.2d 980, 984 (4th Cir. 1992), quoted in ***Burton v. R. J. Reynolds*** (Slip Op. of 12/24/97, at 13).

Under ***RJR***, the documents cannot qualify as work product, because there was no particular pending or impending litigation relating to any RIF at the time the documents or data were compiled. A document created in the course of planning or executing a reduction, regardless of pending or impending litigation is not protected by the work-product doctrine even if it might become useful

in subsequent RIF-related litigation. See *Evans*, *supra*, citing ***First Specific Networks, Inc. v. Atlantic Mutual Insurance Compance***, 163 F.R.D. 574, 582 (N.D. Cal. 1995) ("When it is clear that documents would have been prepared independent of any anticipation of use in litigation . . . no work product protection can attach."). Kissinger's testimony and the Displacement Guidelines themselves show that impact analyses were part of routine business practice — not sparked by current or threatened litigation. Work product protection is not available to Sprint.

## CONCLUSION

Plaintiffs' counsel is learning from ongoing investigation and discovery that impact analyses were done in the routine, ordinary course of business at Sprint during the RIF(s) at issue. For the reasons stated herein, plaintiffs ask that Sprint be ordered to produce <u>all</u> documents and data comprising the factual results of all impact analyses falling within plaintiffs' Requests 1-4. Plaintiffs further request the opportunity to take a Rule 30(b)(6) deposition to nail down details on the use of impact analyses, and to obtain <u>facts</u> in a way that will not violate attorney-client privilege.

**THE POPHAM LAW FIRM, P.C.**

By: /s/ Dennis E. Egan
DENNIS E. EGAN, Bar No. 70672
BERT S. BRAUD, Bar. No. 14223
STEPHEN J. DENNIS, Bar. No. 12453
323 West 8th Street, Suite 200
Kansas City, Missouri 64l05
Telephone: (8l6) 22l-2288
Telecopier: (816) 22l-3999

**KLAMANN & HUBBARD, P.A.**
JOHN KLAMANN, Bar. No. 10190
DIRK L. HUBBARD, Bar. No. 15130
7101 College Blvd., Suite 120
Overland Park, Kansas 66210
Telephone: (913) 327-7600
Telecopier: (913) 327-7800

9

**THE MEYERS LAW FIRM, P.C.**
MARTIN M. MEYERS, Bar No. 14416
222 West Gregory, Suite 340
Kansas City, Missouri 64114
Telephone: 816-444-8500
Telecopier: 816-444-8508

**WHITE, ALLINDER, GRAHAM & BUCKLEY, LLC**
DEBORAH J. BLAKELY, Bar No. 19010
Hidden Creek Law Building
14801 East 42nd St.
Independence, Missouri 64055
Telephone: 816-373-9080
Telecopier: 816-373-9319

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that **Plaintiffs' Memorandum in Support of Motion to Compel Regarding Impact Analyses** was served on counsel for defendant by ECF filing this 20th day of February, 2004, to:

John J. Yates
Patrick F. Hulla
Husch & Eppenberger
1200 Main St., Suite 1700
P.O. Box 26006
Kansas City, Missouri 64105

Christine F. Miller
Sonni L. Fort
Husch & Eppenberger
190 Carondelet Plaza, Suite 600
St. Louis, Missouri 63105-3441

David M. Eisenberg
Baker Sterchi Cowden & Rice, L.L.C.
2400 Pershing, Suite 500
Kansas City, Missouri 64108-2533

Chris R. Pace
Stephany Newport
Sprint Corporation
6450 Sprint Parkway
Overland Park, KS 66251

                                                                           s/ Dennis E. Egan
                                                                           Attorney for Plaintiff