## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SHIRLEY WILLIAMS, et al.,

        Plaintiffs,

v.                             Case No.  03-2200-JWL-DJW

SPRINT/UNITED MANAGEMENT CO.,

        Defendant.

## **MEMORANDUM AND ORDER**

Pending before the Court is a Motion filed by Plaintiffs (doc. 3542) specifically requesting the following relief ("Motion for Relief"):

•     An *in camera* review of sixty-five documents inadvertently disclosed by Defendant, all of which Defendant claims are protected from disclosure by the attorney-client privilege;

•     A determination that the sixty-five documents inadvertently disclosed by Defendant are not privileged and thus do not need to be returned to Defendant; and

•     An Order requiring all similar documents withheld by Defendant on grounds of privilege be produced to Plaintiffs.

After consideration of the evidence presented at the March 2, 2006 and March 10, 2006 closed evidentiary hearing, as well as all pleadings submitted in conjunction with the issue, and for the reasons stated below, the Court finds the sixty-five inadvertently disclosed documents are protected by the attorney-client privilege.

Given the extensive procedural history with regard to this motion, as well as the large number of factual contentions set forth by the parties, a brief outline of the opinion follows:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I.      Procedural Background With Respect to Motion at Issue

II.     Relevant Facts and Issue Presented

III.    Findings of Fact and Conclusions of Law

        A.    Findings of Fact
        B.    Conclusions of Law

              1.    The Attorney-Client Privilege

                    a.    Adverse Impact/Due Diligence Documents

                          i.     Communications Made to Obtain Legal Advice
                          ii.    Communications Made in Confidence
                          iii.   Privilege Has Not Been Waived

                                 a)    Inadvertent Production

                                       i)     Precautions Taken
                                       ii)    Time to Rectify
                                       iii)   Scope of Discovery
                                       iv)    Extent of Disclosure
                                       v)     Fairness

                                 b)    Waiver as a Result of Winkler's Deposition Testimony
                                 c)    Waiver By Affirmative Defense of "Good Faith"

                    b.    Two Other Documents at Issue

                          i.     Document 1205499 (Exhibit YY)
                          ii.    Document 1329540 (Exhibit AAA)

              2.    Work Product Protection

IV.     Conclusion

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## I.    Procedural Background With Respect to Motion at Issue

During the January 19, 2006 status conference, Plaintiffs submitted:

• Written correspondence dated January 9, 2006 from Defendant to Plaintiffs identifying documents inadvertently produced and requesting Plaintiffs return such documents; and

• Written correspondence dated January 18, 2006 from Plaintiffs to the Court requesting an *in camera* review and subsequent determination of Defendant's claim of privilege for the inadvertently disclosed documents.

Notably, the inadvertently disclosed documents at issue primarily consist of identically formatted mathematical spreadsheets – most of which bear the title of "due diligence matrix" and almost all of which include a statement at the bottom of the document regarding "adverse impact" (hereafter "adverse impact/due diligence documents").

The Court construed the two letters as Plaintiffs' Motion for Relief (doc. 3542) seeking (1) an *in camera* review of sixty-five documents inadvertently disclosed and claimed to be privileged by Defendant; (2) a determination that the sixty-five documents inadvertently disclosed by Defendant are not privileged and thus do not need to be returned to Defendant; and (3) an Order requiring all similar documents withheld by Defendant on grounds of privilege be produced to Plaintiffs.  As directed by the Court, Defendant filed a response under seal on January 24, 2006 (doc. 3552) and Plaintiffs filed a reply under seal on January 31, 2006 (doc. 3553).

On February 1, 2006, the Court issued a Memorandum and Order (doc. 3549) ruling on a Motion to Compel (doc. 3203) previously filed by Plaintiffs.  In that Motion, and relevant to the issues currently before the Court, Plaintiffs sought, among other things, to compel production of all documents in Defendant's privilege log that

• failed to identify an attorney as the sender or the recipient;  and

• were described as "adverse impact," "due diligence," or "impact ratio" documents.

Defendant opposed this Motion to Compel on grounds that the referenced documents contained confidential and privileged adverse impact analyses that District Judge Lungstrum previously ruled were not discoverable in this matter. Plaintiffs disagreed, arguing that Judge Lungstrum's ruling was applicable only to the two particular adverse impact documents involved in Judge Lungstrum's *in camera* review, and not to every "adverse impact" or "due diligence" document.

In the February 1, 2006 Memorandum and Order, the Court reviewed Judge Lungstrum's previous ruling on the issue, which was transcribed as follows:

> [A]lthough my earlier ruling was limited to certain documents specifically that I reviewed and said these are clearly within the ambit of attorney/client privilege, I have seen nothing that leads me to believe that age impact documents generated as a specific request in connection with a specific RIF by the legal department of the defendant would be anything other than attorney/client privileged documents …. It appears to me that this case in that sense is garden variety, and so therefore if all there is are documents – no matter how helpful or interesting they would be if I were the plaintiff in this case – that were generated in response to defendant's lawyers saying, We would like to look at this so that we can give you some advice about what you ought to do in connection with that RIF, that's just not something the plaintiffs are going to be able to get to.[1]

With Judge Lungstrum's ruling in mind, and upon a review of the privilege log, the Court found in the February 1, 2006 Memorandum and Order that Defendant met its burden of proof with regard to a claim of protection based on the attorney-client privilege for the various documents described in the privilege log as "adverse impact" and "due diligence."[2]

---

[1]March 31, 2005 Transcript of Proceedings before the Honorable John W. Lungstrum, Exhibit C to Defendant's Index of Exhibits (doc. 3419) at pp. 11-12.

[2]February 1, 2006 Memorandum and Order (doc. 3549).

On February 20, 2006, Plaintiffs filed with District Judge Lungstrum a Motion to Review (doc. 3605) that portion of the February 1, 2006 Memorandum and Order dealing with documents identified as adverse impact analyses in the privilege log. Plaintiffs later requested Judge Lungstrum defer the review until after the undersigned Magistrate had the chance to conduct an *in camera* review and determine whether the representative sample of actual adverse impact/due diligence documents inadvertently produced are protected from disclosure by the attorney-client privilege. Judge Lungstrum granted (doc. 3804) Plaintiffs' request and took the Motion to Review under advisement.

Thus, the Court then addressed the currently pending Motion, which not only deals with documents described as "adverse impact" and "due diligence" on a privilege log, but in addition deals with actual documents inadvertently produced. After reviewing the pleadings filed in conjunction with this Motion, the Court issued an Order on February 23, 2006 (doc. 3617) finding that the information submitted by the parties was insufficient to determine the applicability of the attorney-client privilege and/or the work product doctrine to the inadvertently disclosed documents at issue. More specifically, the Court determined it was not feasible to ascertain from the arguments of counsel and the face of the documents whether the documents qualified as (a) compilations of underlying data; or (b) statistical analyses undertaken at the direction of attorneys.

Based on the Court's need for more information regarding creation and use of the documents in dispute, the Court conducted a closed evidentiary hearing, which commenced on March 2, 2006 and was resumed and concluded on March 10, 2006. At the hearing, Defendant introduced the sixty-five inadvertently disclosed documents at issue, each of which were individually identified by bates stamp number as a one-page document within the following multi-page exhibits:

5

| Bates # | Ex. # | Bates # | Ex. # | Bates # | Ex. # | Bates # | Ex. # |
|---------|-------|---------|-------|---------|-------|---------|-------|
| 1205499 | YY | 1236138 | P | 1237023 | FF | 1339546 | QQ |
| 1235522 | A | 1236175 | Q | 1237030 | GG | 1339547 | QQ |
| 1235539 | B | 1236211 | R | 1237036 | HH | 1339551 | QQ |
| 1235567 | C | 1236219 | S | 1237040 | II | 1339552 | QQ |
| 1235583 | D | 1236236 | T | 1237043 | JJ | 1339589 | RR |
| 1235596 | E | 1236239 | U | 1237046 | KK | 1339590 | RR |
| 1235641 | F | 1236242 | V | 1237049 | LL | 1339594 | RR |
| 1235671 | G | 1236245 | W | 1237059 | MM | 1339595 | RR |
| 1235686 | H | 1236892 | X | 1237068 | NN | 1340435 | SS |
| 1235716 | I | 1236898 | Y | 1237072 | OO | 1340436 | SS |
| 1235724 | J | 1236902 | Z | 1259888 | ZZ | 1340437 | SS |
| 1235768 | K | 1236905 | AA | 1329540 | AAA | 1340438 | SS |
| 1235830 | L | 1236908 | BB | 1335479 | BBB | 1345994 | TT |
| 1235883 | M | 1236911 | CC | 1339401 | PP | 1346031 | UU |
| 1235916 | N | 1236933 | DD | 1339402 | PP | 1347314 | VV |
| 1236088 | O | 1236966 | EE | 1339403 | PP | 1356404 | CCC |
| | | | | | | 1356684 | XX |

## II.    Relevant Facts and Issue Presented

Beginning in the fourth quarter of 2001, and extending approximately through the end of the first quarter of 2003, Defendant engaged in a large scale reduction of its work force ("RIF"). As part of this reorganization process, Defendant maintains it conducted a statistical analysis comparing the demographic data (gender, race and age) of employees targeted for lay off to the demographic data of those who would be retained. Defendant further maintains this "adverse impact" or "due diligence" analysis was performed at the specific request of its attorneys for the purpose of obtaining legal advice regarding the statistical impact on the various groups under the discrimination laws. Defendant maintains that the sixty-one of the inadvertently produced documents are such statistical analyses undertaken at the direction of attorneys. Accordingly, Defendant argues the "adverse impact" and "due diligence" documents and information inadvertently produced are protected from disclosure by the attorney-client privilege and thus must be returned.

6

Plaintiffs disagree, arguing the "adverse impact" and "due diligence" documents are not protected from disclosure by the attorney-client privilege because they are not analyses undertaken at the direction of attorneys but instead are merely data compilations independently generated and utilized by employees within Defendant's Human Resource Department.

## III.   Findings of Fact and Conclusions of Law

### A.    Findings of Fact

At all times relevant to the issue presented, Jill Ferrel ("Ferrel") was employed by Defendant as an attorney in its Law Department.   In her capacity as Defendant's attorney, Ferrel issued a Memorandum dated October 5, 2001 ("Ferrel Memo") to various personnel within the Human Resources ("HR") department.[3]   More specifically, the Ferrel Memo directs HR to gather designated information so that the Law Department can provide legal advice regarding the statistical impact of the RIF on various personnel groups under the discrimination laws.[4]   The Ferrel Memo is stamped "Privileged Attorney-Client Advice" and the *RE:* line designates the subject matter of the written communication as "Adverse Impact Analysis."[5]

At the evidentiary hearing, Defendant provided evidence regarding the process used by the HR Department to gather and present the information requested by the Law Department. For each department or subgroup, an HR person assigned to that department or subgroup prepared three spreadsheets. The first spreadsheet by HR personnel is referred to by the parties as the "Master List."

---

[3]The Ferrel Memo was submitted to the Court *in camera* at the closed evidentiary hearing and has been filed under seal at Defendant's Exhibit FFF.

[4]*Id.*

[5]*Id.*

The Master List contains the names of all employees in the relevant subgroup, as well as associated demographic information for these employees.[6]

The second of the three spreadsheets created by HR personnel is referred to by the parties as the "RIF List." The RIF List contains the names of the employees on the Master List who have been selected for termination as part of the RIF.[7] Both the Master List and the RIF List are created by HR personnel with data obtained from Defendant's database and from Defendant's managers.[8] These two spreadsheets were used for a variety of purposes during the RIF, such as organizing information and comparing candidates; thus, Defendant does not claim attorney-client privilege protection for the Master List or the RIF List.[9]

The third spreadsheet prepared by HR is the "adverse impact" or "due diligence" document.[10] To generate the adverse impact or due diligence spreadsheet for each subgroup, HR personnel drew information from the other two spreadsheets using the methodology outlined by Jill Ferrel in her October 5, 2001 Memorandum.[11] The methodology outlined by the Ferrel Memo included data entry

---

[6]Testimony of Scott Winkler, Sealed Transcript of Proceedings Held on 3/02/2006 at p.26, lines 14-19 (doc. 3742); Excerpt from Eric Rice Deposition, Sealed Hearing Exhibit DDD at pp.5-6.

[7]*Id.*

[8]Testimony of Scott Winkler, Sealed Transcript of Proceedings Held 3/10/2006 at p.57, line 24 through p.58, line 8 (doc. 3820); Testimony of Jim Kissinger, Sealed Transcript of Proceedings Held 3/10/2006 at p.76, lines 4-10 (doc. 3820).

[9]Testimony of Scott Winkler, Sealed Transcript of Proceedings Held on 3/02/2006 at p.36, line 25 through p.37, line 3; p.66, lines 7-10 (doc. 3742); Testimony of Scott Winkler, Sealed Transcript of Proceedings Held 3/10/2006 at p.57, line 24 through p.58, line 14 (doc. 3820).

[10]Testimony of Scott Winkler, Sealed Transcript of Proceedings Held on 3/02/2006 at p.26, lines 3-19 (doc. 3742).

[11]The Ferrel Memo, Sealed Hearing Exhibit FFF.

in various combinations utilizing a formula provided by the Law Department.[12]   The formula automatically generated the adverse impact document in a specific format devised by counsel.[13]

The adverse impact documents were transmitted and/or delivered to Defendant's Legal Department for the purpose of rendering legal advice.[14]  Although sixteen of the sixty-one inadvertently disclosed adverse impact spreadsheets were not explicitly marked with a "Sprint – Internal Use Only Confidential" designation, Defendant presented evidence that these adverse impact spreadsheets were kept confidential by being distributed only to those individuals who had some stated purpose in receiving them and were available only to legal counsel and HR personnel upon entry of a confidential password.[15]

## B.   **Conclusions of Law**

### 1.   **The Attorney-Client Privilege**

The purpose of the attorney-client privilege "is to encourage full and frank communication

---

[12]Testimony of Scott Winkler, Sealed Transcript of Proceedings Held on 3/10/2006 at p.54, lines 14-22 (doc. 3820); Testimony of Jim Kissinger, Sealed Transcript of Proceedings Held on 3/10/2006 at p.71, line 18 through p.72, line 23; p.76, lines 11-20 (doc. 3820).

[13]Testimony of Jim Kissinger, Sealed Transcript of Proceedings Held on 3/10/2006 at p.72, line 24 through p.73, line 6 (doc. 3820).

[14]At the hearing, Defendant submitted Exhibit GGG to the Court *in camera.*  More specifically, Exhibit GGG is a binder containing privileged e-mails establishing that the majority of the adverse impact documents were e-mailed directly to Defendant's counsel.  Defendant presented further evidence at the hearing that adverse impact documents often were personally delivered during meetings with counsel on Defendant's campus.  Testimony of Scott Winkler, Sealed Transcript of Proceedings Held on 3/10/2006 at p.57, lines 6-21 (doc. 3820); Testimony of Jim Kissinger, Sealed Transcript of Proceedings Held on 3/10/2006 at p.73, lines 7-22 (doc. 3820); Testimony of Deborah Sprayberry, Sealed Transcript of Proceedings Held on 3/10/2006 at p.131, line 3 through p.132, line 7 and p.165, lines 3-11 (doc. 3820); Excerpt from Eric Rice Deposition, Sealed Hearing, Exhibit DDD at pp.6-7.

[15]The Ferrel Memo, Sealed Hearing Exhibit FFF at p.4; Excerpt from Eric Rice Deposition, Sealed Hearing Exhibit DDD at pp.24-25.

between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."[16]  The privilege serves the client's need for legal advice, but it also serves the attorney's need to receive complete information in order to give the proper advice. The privilege protects communications with in-house, as well as outside, counsel.[17]

"Not every communication between an attorney and client is privileged, only confidential communications which involve the requesting or giving of legal advice."[18]  "The focal point of the protection afforded by the attorney-client privilege lies with 'communications' between attorneys and their clients" related to legal advice.[19]  Legal advice must predominate for the communication to be protected.[20] The privilege does not apply where the legal advice is merely incidental to business advice.[21] And, although the privilege protects disclosure of substantive communication between attorney and client, "it does not protect disclosure of the underlying facts by those who communicated with the attorney."[22]

In *Upjohn*,[23] the United States Supreme Court distinguished between disclosure of *underlying*

---

[16]*Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

[17]*Id.* at 390.

[18]*Burton v. R.J. Reynolds Tobacco Co.,*, 175 F.R.D. 321, 327 (D. Kan. 1997) (citing *Fisher v. United States*, 425 U.S. 391, 403 (1976); *United States v. Olano*, 62 F.3d 1180 (9th Cir. 1995)).

[19]*IMC Chemicals, Inc. v. Niro, Inc.*, No. 98-2348, 2000 WL 1466495, at *8-9 (D. Kan. July 19, 2000) (quoting *Upjohn Co.*, 449 U.S. at 395-96).

[20]*Burton v. R.J. Reynolds Tobacco Co., Inc.*, 170 F.R.D. 481, 484 (D. Kan. 1997)(citation omitted).

[21]*Id.*

[22]*Upjohn*, 449 U.S. at 395-96.

[23]*Id.*

10

*facts* and disclosure of privileged *communications*. The Court held that "[t]he protection of the privilege extends only to *communications* and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing."[24] The Court explained: "The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication with his attorney."[25]

Because this action arises under a federal statutory scheme, federal law provides the rule of decision as to application of the attorney-client privilege.[26] Under federal common law, the essential elements of the attorney-client privilege are: (1) Where legal advice is sought (2) from a professional legal advisor in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived.[27] The party seeking to invoke the attorney-client privilege bears the burden of establishing its applicability.[28] Applying these factors to the privilege issues disputed by the parties here, the Court finds Defendant must establish – for

---

[24]*Id.* (emphasis in original) (quoting *Philadelphia v. Westinghouse Elec. Corp.*, 205 F. Supp. 830, 831 (E.D. Pa. 1962).

[25]*Id.* at 396.

[26]*See Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1368-69 (10th Cir. 1997) (federal privilege law applies to federal claim). No real conflict between federal and Kansas law regarding attorney-client privilege exists. *See Hiskett v. Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 405 (D. Kan. 1998).

[27]*Great Plains Mut. Ins. Co. v. Mutual Reinsurance Bureau,* 150 F.R.D. 193, 196 (D. Kan. 1993).

[28]*In re Foster,* 188 F.3d 1259, 1264 (10th Cir. 1999).

both the adverse impact/due diligence document and the other "non-adverse impact" documents –

that first, the communications at issue were made for the purpose of obtaining legal advice from the

lawyer; second, the communications were made in confidence; and third, the privilege was not

waived.

### a. Adverse Impact/Due Diligence Documents

Applying these legal standards to the facts presented, the Court concludes the adverse impact

documents inadvertently disclosed by Defendant and submitted for *in camera* review by the Court

are protected from disclosure by the attorney-client privilege. In other words, the evidence presented

by Defendant sufficiently demonstrates that the adverse impact/due diligence documents were

generated at the direction of counsel – pursuant to the Ferrel Memo – for the purpose of rendering

legal advice and, after such generation, were then provided to counsel for analysis.[29]

---

[29]For the evidence relating to inadvertently disclosed documents within Exhibits A, B, C, D, E, F, G, H and I, see Winkler Testimony from 3/02/2006 at pp. 28-30, 32-33, 40-43, 48 and 52 (doc. 3742).

For the evidence relating to inadvertently disclosed documents within Exhibits J-N and TT-XX, see Winkler Testimony from 3/02/2006 at pp. 44-52 (doc. 3742) and Excerpt from Eric Rice Deposition, Sealed Hearing Exhibit DDD at pp. 7-15.

For the evidence relating to inadvertently disclosed documents within Exhibits O-OO, see Winkler Testimony from 3/02/2006 at pp.52-57 (doc. 3742) and Excerpt from Eric Rice Deposition, Sealed Hearing Exhibit DDD at pp.16-18.

For the evidence relating to inadvertently disclosed documents within Exhibits PP, QQ and RR, see Sprayberry Testimony from 3/10/2006 at pp.129-132, 134, 160 and 165 (doc. 3820).

For the evidence relating to inadvertently disclosed documents within Exhibit SS, see Eisler Testimony from 3/10/2006 at pp.166-169 (doc. 3820).

i.      **The Communications Were Made For the Purpose of Obtaining Legal Advice**

The Court finds Defendant's due diligence matrices and adverse impact spreadsheets were made at the direction of Defendant's Law Department in order to secure legal advice from counsel and were not mere compilations of non-privileged business data and underlying facts.  In support of this finding, the Court relies on the October 5, 2001 Ferrel Memo submitted *in camera* and filed under seal, which specifically directs Defendant's HR Department to gather designated information so that its Law Department can perform adverse impact analyses in connection with Defendant's RIF.  The evidence establishes that Defendant's HR personnel followed the specific methodology outlined by Ferrel in her October 5, 2001 memo in creating these documents.  More specifically, the methodology outlined by the Ferrel Memo included data entry in various combinations utilizing a formula and format provided by the Law Department.

In addition to the Ferrel Memo, Defendant also submitted evidence demonstrating that the adverse impact documents were forwarded to counsel via email – or in person – for the purpose of obtaining legal advice.  More specifically, Sprint submitted a binder at the hearing that contains privileged e-mails for *in camera* review by the Court.  These e-mails establish that the majority of the adverse impact documents were e-mailed directly to Sprint's counsel. Moreover, Defendant presented further evidence at the hearing that adverse impact documents often were personally delivered during meetings with counsel on the Sprint campus.

Plaintiffs' argument that the calculations necessary for adverse impact analysis are not privileged or confidential, but instead are readily available in the public domain, does not defeat the privilege.  The Court agrees that the commonly accepted, longstanding benchmark for evaluating

13

disparate impact is the "four-fifths rule" of the Uniform Guidelines on Employee Selection Procedures[30] adopted by the Equal Opportunity Commission ("EEOC Guidelines"), which provides a selection rate that "is less than [80%] of the rate for the group with the highest rate will generally be regarded" as evidence of adverse impact.  Whether this information is in the public domain, however, is simply immaterial to Defendant's claim of attorney-client privilege for the adverse impact/due diligence documents. As the United States Supreme Court explains, "[a] fact is one thing and a communication concerning that fact is an entirely different thing."[31] The Court further explains: "The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication with his attorney."[32]

As Plaintiffs assert, the "four-fifths rule" is in the public domain and, thus, the "four-fifths rule" is a discoverable underlying fact. As the United States Supreme Court admonishes, however, "a communication concerning that fact is an entirely different thing." Here, Defendant provides sufficient evidence for the Court to find that the adverse impact/due diligence analyses are such a communication and thus are protected from disclosure by the attorney-client privilege.

Plaintiffs also argue that the documents are not privileged because the privileged information was exchanged among various HR personnel prior to forwarding the information to legal counsel. The Court is not persuaded by this argument.  The essential elements of the privilege as defined

---

[30]29 C.F.R. § 1607.4(D) (2005).

[31]*Upjohn*, 449 U.S. at 395-96  (emphasis in original) (quoting *Philadelphia v. Westinghouse Elec. Corp.*, 205 F. Supp. 830, 831 (E.D. Pa. 1962).

[32]*Id.* at 396.

above do not require an attorney to have either authored or received the document at issue in order to maintain the privilege. A party may successfully demonstrate applicability of the privilege to written communication between corporate management employees by establishing that the communication was made in confidence for the primary purpose of obtaining legal advice.[33] Organizational clients and business entities often are personified by a number of employees. In preparation for, or in the midst of, consultations with an attorney, employees of the client will often consult one another to ensure that the attorney's advice is based on full knowledge of all relevant facts. With regard to the attorney-client privilege, the United States Supreme Court specifically acknowledges that "sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client."[34]  The Court goes on to say that "[t]he lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out."[35]

Simply put, the evidence demonstrates that the written communications here – the due diligence matrices and adverse impact spreadsheets – were made at the direction of the Law Department in order to secure legal advice from counsel and were not mere compilations of non-

---

[33]*See Lintz v. American Gen. Fin., Inc.,* Civ. 98-2213-JWL, 1999 WL 450197, at *4 (D. Kan. June 24, 1999) (holding that although written communication between management employees of defendant is not necessarily protected by the attorney-client privilege, defendant successfully demonstrated applicability of privilege by establishing that written communication was confidential in nature and contained legal advice obtained from counsel for defendants).

[34]*Upjohn*, 449 U.S. at 389 (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)).

[35]*Id.*

15

privileged business data and underlying facts.[36]   Notably, Defendant has not made a claim of privilege for – and, in fact, has produced – the relevant, underlying data (e.g., Master List and RIF List) from which Plaintiffs may make their own adverse impact analysis using the "four-fifths rule" included within the EEOC Guidelines.  And, even if – as a result of legal advice – an employee was added or deleted from the RIF list, Plaintiffs still are free to inquire of the actual decision makers as to the basis of their termination decisions.

### ii.    Communications Were Made in Confidence

Under the common law, a critical component of the privilege "is whether the communication between the client and the attorney is made in confidence of the relationship and under circumstances from which it may reasonably be assumed that the communication will remain in confidence."[37] Because confidentiality is key to the privilege, "[t]he attorney-client privilege is lost if the client discloses the substance of an otherwise privileged communication to a third party."[38] The Tenth Circuit has admonished that  "the confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived. The courts will grant no greater

---

[36]*See Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1550-51 (10th Cir. 1995) (court found no abuse of discretion in the district court's decision to protect as privileged multiple lists prepared at the request of counsel in order to provide legal advice about a corporate restructuring); *McDonnell Douglas Corp. v. EEOC*, 922 F. Supp. 235 (E.D. Mo. 1996) (court held documents containing adverse impact analyses on employees of reduction in force, which were prepared at request of counsel for purposes of rendering legal advice and were kept confidential, were protected by attorney-client privilege).

[37]*In re Qwest Communications Intern. Inc.*, -- F.3d --, 2006 WL 1668246 at *5 (10th Cir. June 19, 2006) (citing *United States v. Lopez*, 777 F.2d 543, 552 (10th Cir.1985)).

[38]*Id.* (citing *United States v. Ryans*, 903 F.2d 731, 741 n.13 (10th Cir.1990)).

protection to those who assert the privilege than their own precautions warrant."[39] "Any voluntary disclosure by the client is inconsistent with the attorney-client relationship and waives the privilege."[40]

Plaintiffs argue Defendant failed to treat the adverse impact documents confidentially, which as noted above is an essential element to maintaining the privilege.  The Court disagrees.

As a preliminary matter, the evidence establishes that all of the adverse impact documents were protected by a password available only to HR and Legal Department personnel.  Moreover, most of the adverse impact matrices inadvertently disclosed were marked "Sprint - Internal Use Only Confidential" directly under the tables.  Contrary to Plaintiffs' assertion, the Court finds this marking readily distinguishable from the "PRIVILEGED CONFIDENTIAL" marking associated with this lawsuit, the font of which is identical to the bates stamp and "REDACTED" markings.

Also contrary to Plaintiffs' assertions, there is ample evidence to demonstrate that recipients of the privileged adverse impact information were aware of the confidential nature of such information, as well as the purpose for which the information was to be used: obtaining legal advice.[41] Plaintiffs have submitted no conflicting evidence.  Plaintiffs' argument that adverse impact documents were disseminated to employees who had no purpose for receiving them is not supported

---

[39]*Id.*

[40]*Id.* (citing *United States v. Bernard*, 877 F.2d 1463, 1465 (10th Cir.1989)).

[41]The Ferrel Memo, Sealed Hearing Exhibit FFF at p.4; Excerpt from Eric Rice Deposition, Sealed Hearing Exhibit DDD at pp.24-25; Testimony of Scott Winkler, Sealed Transcript of Proceedings Held on 3/02/2006 at pp.28, 38-39, 42, 45 and 52 (doc. 3742);  Testimony of Scott Winkler, Sealed Transcript of Proceedings Held 3/10/2006 at pp. 57 and 59 (doc. 3820); Testimony of Jim Kissinger, Sealed Transcript of Proceedings Held 3/10/2006 at p.73 (doc. 3820); Testimony of Deborah Sprayberry, Sealed Transcript of Proceedings Held 3/10/2006 at pp.131 and 165 (doc. 3820).

by the record.

To that end, Plaintiffs make reference to the testimony of two of Defendant's employees. First, Plaintiffs maintain Deborah Sprayberry stated at the hearing that although she was sent the adverse impact matrices, "she had no use for them whatsoever, and that she simply kept the final matrices in her files."[42]  What Ms. Sprayberry's actually states, however, is that during the relevant time period,

- she was the manager of Regional HR operations and supported the field HR managers from headquarters;[43] and

- she received the adverse impact documents for the purpose of creating employee separation packages and permanently retaining the data.[44]

As their second example, Plaintiffs allege Gina Eisler received the adverse impact documents and had no need for them.  Again, what Ms. Eisler actually states is that during the relevant time,

- she was the HR manager supporting PCS sales and marketing;[45]

- she was working directly with in-house attorney Stephany Newport in conjunction with the RIF;[46] and

- she received the adverse impact documents for the purpose of transmitting them to her liaison in the Legal Department, Stephany Newport.[47]

---

[42]Plaintiffs' Brief at p.38. (doc. 3847).

[43]Testimony of Deborah Sprayberry, Sealed Transcript of Proceedings Held 3/10/2006 at p.128, lines 10-21 (doc. 3820).

[44]*Id.* at p.150, lines 17-19 (doc. 3820).

[45]Testimony of Gina Eisler, Sealed Transcript of Proceedings Held 3/10/2006 at p.166, lines 20-23 (doc. 3820).

[46]*Id.* at p.169, lines 10-19.

[47]*Id.* at p.171, lines 21-23.

Plaintiffs presents no other evidence to support their proposition; thus, the Court finds the adverse impact analyses were disseminated only to those individuals who had some stated purpose in receiving them.

### iii.      The Privilege Has Not Been Waived

With respect to the attorney-client privilege, one of the essential elements that must be established is that the privilege has not been waived.[48]   The burden to establish that waiver has not occurred remains with the party who is asserting the attorney-client privilege.[49]  "It has long been the law that a client may waive protection of the [attorney-client] privilege, either expressly or impliedly."[50] With respect to a corporation, such as Defendant, "the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors."[51]   A mere employee "cannot waive the corporation's privilege."[52]

Plaintiffs assert they are not required to return the adverse impact documents because: (1) Defendant waived the privilege by its inadvertent production of the documents; (2) Defendant waived the privilege as a result of Scott Winkler's deposition testimony; and (3) Defendant waived the privilege by asserting an affirmative defense of "good faith."  The Court is not persuaded by any of these assertions.

---

[48]*Johnson v. Gmeinder*, 191 F.R.D. 638, 642-43 (D. Kan. 2000); *ERA Franchise System, Inc. v. Northern Ins. Co. of New York*, 183 F.R.D. 276, 278 (D. Kan. 1998) (citations omitted).

[49]*Gmeinder*, 191 F.R.D. at 643.

[50]*United States v. Stewart*, 51 F.Supp.2d 1147,1151 n. 3 (D. Kan. 1999).

[51]*Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348-49 (1985).

[52]*Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1371 (10th Cir.1997) (*quoting United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir.1996)).

### a)       Inadvertent Production

Plaintiffs claim that Defendant waived the attorney-client privilege when it inadvertently produced the adverse impact documents to Plaintiffs.  Courts in this district apply a five-factor test to determine whether the inadvertent disclosure of a document constitutes a waiver of the attorney-client privilege or of work-product protection.[53] These five factors include: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure; (2) the time taken to rectify the error; (3) the scope of discovery; (4) the extent of disclosure; and (5) the overriding issue of fairness.[54] Thus, the Court will consider each of these five factors to determine whether Defendant has waived the attorney-client privilege for the inadvertently produced documents.

### i)       Precautions Taken

With regard to this first factor, the Court finds Defendant's efforts to prevent inadvertent disclosure were reasonable.   Defendant maintains in its briefing that prior to production, all the adverse impact documents were converted to TIFF images and were reviewed on the computer screen by attorneys in an effort to avoid production of privileged documents.[55] Defendant further maintains that it implemented document production software (1) to label as "privileged" all privileged documents and portions thereof; and (2) to earmark such documents and portions thereof

---

[53]*Employer's Reinsurance Corp. v. Clarendon Nat. Ins. Co.*, 213 F.R.D. 422, 428 (D. Kan. 2003) (citing *Zapata v. IBP, Inc.*, 175 F.R.D. 574, 576-77 (D. Kan. 1997)).

[54]*Id.* (citing *Wallace v. Beech Aircraft Corp.*, 179 F.R.D. 313, 314 (D. Kan. 1998); *Zapata*, 175 F.R.D. at 577; *Kansas City Power & Light Co. v. Pittsburg & Midway Coal Mining Co.*, 133 F.R.D. 171, 172 (D. Kan. 1989)).

[55]Sprint's Sealed Post-Evidentiary Hearing Reply Brief at pp.19-20 (doc. 3863).

for inclusion within the privilege log.[56]

Defendant has produced tens of thousands of documents, and literally hundreds of thousands of pages in this case, both in hard copy and electronically. With regard to such a production, the Court finds it instructive to consider the advisory committee's comment to the proposed amendment to Fed. R. Civ. P. 26(f), which acknowledges that privilege waiver issues "often become more acute when discovery of electronically stored information is sought." The committee goes on to explain that "[t]he volume of such data, and the informality that attends use of e-mail and some other types of electronically stored information, may make privilege determinations more difficult, and privilege review correspondingly more expensive and time consuming. Other aspects of electronically stored information pose particular difficulties for privilege review."[57]

Based on the circumstances presented, the Court finds that the precautions taken by Defendant to prevent inadvertent disclosure were reasonably adequate.[58] Accordingly, this factor weighs against waiver.

---

[56]*Id.* at 20.

[57]Comment to proposed amendment to Fed. R. Civ. P. 26(f) at p.24 (effective December 1, 2006), accessed on June 30, 2006 at http://www.uscourts.gov/rules/EDiscovery_w_Notes.pdf.

[58]See, e.g., *Kansas City Power & Light*, 133 F.R.D. at 172 (holding the precautions were adequate where plaintiff's counsel reviewed each document and retained the withheld documents in its files); *Wallace*, 179 F.R.D. at 314 (holding the precautions were adequate where all documents were reviewed by counsel and a legal assistant before making them available for review by opposing counsel).

### ii)    <u>Time to Rectify</u>

The relevant time frame for rectifying the inadvertent disclosure begins when a party discovers, or with reasonable diligence should have discovered, the inadvertent disclosure. [59] In this case, Plaintiffs do not dispute that Defendant sought to rectify the disclosure promptly after actually discovering it. Accordingly, this factor also weighs against waiver.

### iii)    <u>Scope of Discovery</u>

In light of the hundreds of thousands of pages of documents produced by Defendant in this case, the Court has no difficulty concluding that Defendant produced a sufficient number of documents for the Court to find that this third factor weighs against waiver. [60]

### iv)    <u>Extent of Disclosure</u>

The fourth factor considers the extent to which the documents were disclosed. Although "[m]eaningful use of the documents disclosed is often sufficient to find extensive disclosure," [61] the facts here establish that Defendant only has produced the documents to Plaintiffs and, as ordered by the Court, Plaintiffs have not utilized or disseminated the documents inadvertently produced. Accordingly, this factor also weighs against waiver. [62]

---

[59]*Zapata*, 175 F.R.D. at 577; *Kansas City Power & Light*, 133 F.R.D. at 172.

[60]*See, e.g., Zapata*, 175 F.R.D. at 577 (D. Kan.1997) (finding document production was extensive where 40,000 documents were produced in discovery and 1,000 were produced with the privileged document); *Monarch Cement Co. v. Lone Star Indus.*, 132 F.R.D. 558, 560 (D. Kan.1990) (finding document production was extensive where 9,000 documents were produced).

[61]*Employer's Reinsurance Corp. v. Clarendon Nat. Ins. Co.*, 213 F.R.D. at 429 (citations omitted).

[62]*See, e.g., Monarch*, 132 F.R.D. at 560 (finding disclosure was not extensive where the document was only disseminated to opposing counsel); *Wallace*, 179 F.R.D. at 315 (same).

v)      **Fairness**

Lastly, the fifth factor is fairness. Ordinarily, the "[k]ey to the court's consideration of this factor is the relevancy of the documents."[63]  Although the Court has no difficulty concluding that the adverse impact documents inadvertently disclosed are relevant to this litigation, the Court again acknowledges that Defendant has produced the relevant, underlying data (e.g., Master List and RIF List) from which Plaintiffs may make their own adverse impact analysis.  And, even if – as a result of legal advice – an employee was added or deleted from the RIF list, Plaintiffs still are free to inquire of the actual decision makers as to the basis of their termination decisions.  In sum, fairness requires that Plaintiffs not be allowed to make use of the adverse impact documents.  Accordingly, this fifth factor weighs against finding a waiver.

Because all five factors weigh against a finding of waiver, the Court finds Defendant has not waived the attorney-client privilege with respect to the inadvertently disclosed adverse impact documents.

b)      **Waiver as a Result of Scott Winkler's Deposition Testimony**

Plaintiffs assert Defendant waived the attorney-client privilege when it permitted Scott Winkler to testify, without objection, regarding the Ferrel Memo during his deposition.  Defendant disagrees, arguing that the testimony provided by Winkler did not waive the privilege because Winkler did not disclose the content of any privileged communication but instead only discussed the Ferrel Memo in terms of its general directive to run the adverse impact at different levels.  The Court agrees with Defendant.

---

[63] *Wallace*, 179 F.R.D. at 315.

23

For the testimony of Winkler to constitute a waiver of the attorney-client privilege, it had to have disclosed the substance of privileged communications.[64]  Underlying facts are not protected by the privilege.[65]  Furthermore, revealing the "general topic of discussion" between attorney and client does not waive the privilege, unless such revelation also reveals the substance of a protected communication.[66]

Applying the facts to the law here, the Court finds that Winkler's reference to the Ferrel Memo reveals information only about the general topic of the memo and did not reveal the substance of an attorney-client privileged protected communication.  Accordingly, the Court finds no waiver as a result of Scott Winkler's deposition testimony.

c)      **Waiver By Asserting Affirmative Defense of "Good Faith"**

In support of this argument, Plaintiffs assert Defendant waived the attorney-client privilege with respect to the inadvertently produced adverse impact documents by putting in issue Defendant's intent to discriminate, which Defendant allegedly did by denying Plaintiffs' allegations of wilful discrimination and asserting a good faith affirmative defense. The Court finds Plaintiffs' argument to be without merit.

As a preliminary matter, asserting an affirmative defense of good faith does not automatically

---

[64]*See Aquinaga v. John Morrell & Co.,* 112 F.R.D. 671, 683 (D. Kan. 1986) (applying Kansas law).

[65]*Upjohn*, 449 U.S. at 396.

[66]*Burton v. R.J. Reynolds Tobacco Co.*, 177 F.R.D. 491, 499 (D. Kan. 1997).

24

place advice of counsel at issue.[67]   In fact, the Court finds that in alleging wilful – and thus intentional – discrimination, it is Plaintiffs who introduced into this lawsuit the issue of whether Defendant acted in "good faith."  Thus, it is Plaintiffs who bear the burden of proof on that subject. Defendant's affirmative assertion of good faith in answer to the Complaint does not alter these facts.

### b.      Two Other Documents at Issue[68]

### i.      Document 1205499 (Exhibit YY)

This documents is a RIF list for "Parkinson 7/15" with handwritten notations on it.  In support of its claim of privilege with regard to selected portions of the handwritten notes, Defendant provides a "Declaration of Faith Palmer,"[69] within which Ms. Palmer avers under oath that the selected portions of the handwritten notes reflect legal advice given to her by Sprint in-house attorney Pat Hulla.  Based on Ms. Palmer's affidavit and a review of the handwritten notes, the Court finds Defendant has carried its burden of establishing that the selected notations referenced by Ms. Palmer are protected from disclosure by the attorney-client privilege.[70]   In so finding, the Court rejects Plaintiffs' claim that Defendant asserts only work product protection with regard to this

---

[67]*SmithKline Beecham Corp. v. Apotex Corp.*, No. 99-CV-4304, 2005 WL 2436662 (E.D. Pa. Sept. 28, 2005) (citing Paul R. Rice, *Attorney-Client Privilege in the United States* § 9.48, at 182 (2d ed. 1999) ("Only if the defendant elects to offer evidence to disprove the claim, and relies upon the attorney's advice to do so, will the plaintiff be given access to protected communications.").

[68]Although there originally were four "other" (e.g., non-"adverse impact") documents inadvertently produced for which Defendant claimed a privilege, the parties were able to come to an agreement with regard to two of the four documents.

[69]Affidavit of Faith Palmer, Sealed Hearing Exhibit YY.

[70]*See Burton v. R.J. Reynolds Tobacco Co.*, 170 F.R.D. at 484 (the attorney-client privilege protects confidential communications between an attorney and client which occur in the course of giving or requesting legal advice.).

document.  This is because  Plaintiffs have provided no evidence supporting such a claim.

### ii.     Document 1329540 (Exhibit AAA)

This document is one-half page of handwritten notes.  In support of its claim of privilege, Defendant submits the "Affidavit of Beth Forwalder,"[71] who at all relevant times has been employed by Defendant as an attorney.  In the affidavit, Ms. Forwalder avers under oath that the handwritten notes reflected on document 1329540 are consistent with legal advice she provided to HR personnel during a presentation she made at a meeting on or about January 8, 2003.  Ms. Forwalder further avers under oath that the purpose of her presentation to this group was to provide legal advice concerning adverse impact and risk analysis regarding the RIF process and the handwritten notes reflect the advice given.  Based on Ms. Forwalder's affidavit and a review of the handwritten notes, the Court finds Defendant has carried its burden of establishing that the handwritten notes referenced by Ms. Forwalder are protected from disclosure by the attorney-client privilege.[72]  In so finding, the Court rejects Plaintiffs' claim that Defendant asserts only work product protection with regard to this document.  This is because, again, Plaintiffs have provided no evidence supporting such a claim.

### 2.     Work Product Protection

Because the Court finds the sixty-five inadvertently disclosed documents are protected from disclosure by the attorney-client privilege, there is no need for the Court to determine whether the documents at issue are also protected from disclosure by the work product doctrine.

---

[71]Affidavit of Beth Forwalder, Sealed Hearing Exhibit EEE.

[72]*See Burton v. R.J. Reynolds Tobacco Co.*, 170 F.R.D. at 484 (the attorney-client privilege protects confidential communications between an attorney and client which occur in the course of giving or requesting legal advice.).

IV.    **Conclusion**

For the reasons stated above, the Motion for Relief filed by Plaintiffs (doc. 3542) is granted in part and denied in part to the extent that

- The Court has conducted an *in camera* review of the sixty-five documents inadvertently disclosed by Defendant;

- The Court hereby determines the adverse impact/due diligence documents inadvertently disclosed by Defendant are protected from disclosure by the attorney-client privilege and thus must be returned to Defendant;

- The Court hereby determines that the inadvertently disclosed handwritten notes at issue within documents bearing bates stamps 1205499 (Exhibit YY) and 1329540 (Exhibit AAA) are protected from disclosure by the attorney-client privilege; and

- Plaintiffs' request for production of all documents similar to the inadvertently produced adverse impact/due diligence documents is denied.

Accordingly, it is hereby ORDERED that Plaintiffs shall return the documents at issue, and all copies thereof, within five (5) days from the date of this Memorandum and Order.  It is further ORDERED that Plaintiffs shall be prohibited from using these documents in any manner.

IT IS SO ORDERED.

Dated in Kansas City, Kansas on this 1st day of July, 2006.


s/ David J. Waxse
David J. Waxse
United States Magistrate Judge

cc:    All counsel and *pro se* parties

27