IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

**Shirley Williams et al.,**

      **Plaintiffs,**

**v.**                                                  **Case No. 03-2200-JWL**

**Sprint/United Management Company,**

      **Defendant.**

## MEMORANDUM & ORDER

Plaintiff Shirley Williams filed this suit on behalf of herself and others similarly situated asserting that her age was a determining factor in defendant's decision to terminate her employment during a reduction-in-force (RIF). This case has been provisionally certified as a collective action pursuant to 29 U.S.C. § 216(b) and the parties are presently engaged in discovery concerning the merits of plaintiffs' pattern and practice allegations.

This matter is presently before the court on plaintiffs' motion to review (doc. 4196) and objections to the magistrate judge's March 21, 2006 order compelling plaintiffs to respond to defendant's Fourth Interrogatory No. 2. Because of the broad discretion that resides with the magistrate judge to manage the pretrial docket and to control discovery, it is with some reluctance that the court grants plaintiffs' motion and sets aside the magistrate judge's order. Nonetheless, as defendant's interrogatory implicates significant evidentiary issues concerning both the anticipated decertification motion as well as the first phase of trial in this pattern and

practice case, the court believes plaintiffs' motion provides the court an opportunity to share with the parties in some detail its perception of what type of evidence is relevant for purposes of defendant's anticipated decertification motion and the first phase of trial if such motion is denied.

*Background*

Defendant's Fourth Interrogatory No. 1 asked plaintiffs to identify every company-wide policy, practice or procedure that plaintiffs believe defendant used to engage in a pattern and practice of age discrimination between October 1, 2001 and March 31, 2003. Defendant's Fourth Interrogatory No. 2 stated as follows:

> For each policy, practice, or procedure identified in response to Interrogatory 1 above, identify the name of each individual who has filed a Consent to Join in this matter, and any individual who has sought to consolidate his or her case with this matter, who was terminated during a reduction in force as a direct result of the application of such policy, practice or procedure.

Plaintiffs objected to this interrogatory on the grounds that the information sought is not relevant to the first phase of this pattern and practice case and, citing to the Tenth Circuit's opinion in *Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095 (10th Cir. 2001), that plaintiffs are not required in this phase to establish any causal connection between a particular pattern or practice and all of the individual plaintiffs who are allegedly affected by such pattern and practice. Without waiving that objection, plaintiffs further responded that "all of the opt-in plaintiffs were subjected to some or all" of the policies, practices and procedures identified in response to Interrogatory No. 1.

2

On March 21, 2006, the magistrate judge overruled plaintiffs' objection and compelled plaintiffs to answer Interrogatory No. 2. In so doing, the magistrate judge explained:

> The Court finds that Defendant's interrogatory is relevant to the pattern and practice phase of this case. Defendant may properly ask Plaintiffs to identify individuals who were terminated during a RIF as a direct result of the application of the "repeated, routine, and/or generalized policies, practices and procedures" ste forth in their response to Interrogatory No. 1. It is entitled to ask this regardless of what the Court may ultimately determine to be Plaintiffs' burden of proof.

The magistrate judge further concluded that plaintiffs' response that all opt-ins were subjected to "some or all" of the policies, practices and procedures identified in response to Interrogatory No. 1 was an inadequate response to the Interrogatory. Thereafter, plaintiffs requested that the magistrate judge reconsider his order and, on April 25, 2006, the magistrate judge declined to do so.

Plaintiffs now object to the magistrate judge's order, contending that it should be set aside for three reasons: (1) plaintiffs are not required to show a causal connection between a pattern or practice of age discrimination and the termination of any individual plaintiff during the initial phase of this pattern and practice case; (2) plaintiffs are not required to show a causal connection between a pattern or practice of age discrimination and the termination of any individual plaintiff at any phase of this litigation; and (3) it is manifestly unjust to require plaintiffs to respond to the Interrogatory given the court's prior prohibitions against individualized discovery and Sprint's successful objections based upon so called "individual issues."

With respect to the second and third bases set forth by plaintiffs, defendant contends that plaintiffs have waived these arguments by not presenting them to the magistrate judge in a timely

3

fashion. Indeed, the record reflects that plaintiffs did not raise their second argument at any time in the proceedings before the magistrate judge and that this argument is therefore waived. *See Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) (theories and issues raised for the first time in objections to the magistrate judge's decision are deemed waived). Plaintiffs raised their manifest injustice argument for the first time in their motion to reconsider presented to the magistrate judge; the magistrate judge, appropriately, did not consider this argument at that juncture and the court declines to do so now. *Cashner v. Freedom Stores, Inc.*, 98 F.3d 572, 577 (10th Cir. 1996) (inappropriate to advance new arguments in motion to reconsider). The court, then, focuses here only on the first argument advanced by plaintiffs–that defendant's Interrogatory No. 2 seeks information not relevant to the initial phase of this pattern and practice case as plaintiffs are not required during this phase to establish a causal connection between any particular pattern or policy of age discrimination and the termination of any individual plaintiff.

*Applicable Standard*

Magistrate judges may issue orders as to non-dispositive pretrial matters and district courts review such orders under a "clearly erroneous or contrary to law" standard of review. *First Union Mortgage Corp. v. Smith*, 229 F.3d 992, 995 (10th Cir. 2000) (quoting *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1461-62 (10th Cir. 1988)); 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a). The clearly erroneous standard applies to factual findings, *see* 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 3069, at 355 (2d ed.1997) (and cases cited therein), and requires that the district court affirm unless it

4

is left with the "definite and firm conviction that a mistake has been committed." *Ocelot Oil*, 847 F.2d at 1464 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

*Discussion*

As stated above, the magistrate judge concluded that defendant's interrogatory asking plaintiffs to identify each plaintiff who was the victim of each allegedly discriminatory policy or practice was relevant to this phase of plaintiffs' pattern and practice case. In reviewing this conclusion, the court must begin with the Tenth Circuit's decision in *Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095 (10th Cir. 2001), wherein the Circuit, relying on the Supreme Court's decision in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), discussed at length the nature of the plaintiffs' burden at the first stage of a pattern and practice case:

> During the first stage of trial, the plaintiffs' burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers. Thus, at the initial, liability stage of a pattern-or-practice suit the plaintiffs are not required to offer evidence that each person for whom they will ultimately seek relief was a victim of the employer's discriminatory policy. Instead, plaintiffs' burden is to establish that such a policy existed.

*Id.* at 1106 (alterations, citations and quotations omitted). According to the Circuit, only in the second stage of the litigation "must [it] be determined whether each individual plaintiff was a victim of the discriminatory practice." Moreover, if the plaintiffs have prevailed at the first stage and established a pattern or practice of discrimination, then the plaintiffs are "entitled to a

5

presumption that the individual employment actions taken against them were the result of such discrimination." *Id.* at 1107. Under *Thiessen*, then, the issue of whether any particular plaintiff was the victim of the defendant's alleged discriminatory practice is not one that the jury would be asked to consider at the first phase or that the plaintiffs would be required to prove at the first phase. Indeed, assuming plaintiffs prevail at the first phase of trial, the jury presumes in the second trial that each plaintiff was the victim of the discriminatory practice.

Under *Thiessen*, then, Sprint's interrogatory is irrelevant to plaintiffs' proof at the first phase trial. Sprint asserts that *Thiessen* is distinguishable because *Thiessen* concerned a facially discriminatory policy–the "blocker" policy–such that the court could presume that, if it continued to exist, members of the class would necessarily be victims of the policy. According to Sprint, plaintiffs in this case have identified only facially neutral policies such that the court cannot presume an adverse affect on the class. Because of the "facially neutral" nature of the policies identified by plaintiffs, Sprint contends that plaintiffs must prove that Sprint used the policies to discriminate and, to do so, must establish that individual plaintiffs suffered as a direct result of those policies. Sprint, then, asserts that its Fourth Interrogatory No. 2 is relevant because it provides the requisite link between the policies identified by plaintiffs and the impact on the class. Assuming, without deciding, that Sprint's distinction between facially discriminatory and facially neutral policies is a significant one for purposes of analyzing the relevance of its interrogatory, the court rejects Sprint's argument as the practices and policies

6

challenged by plaintiffs are, like the blocker policy in *Thiessen*, facially discriminatory.[1]

According to Sprint, the policies identified by plaintiffs are akin to other facially neutral policies maintained by Sprint such as its policy of requiring its employees to disclose their Social Security numbers to Sprint and its policy of withholding income and Social Security taxes from its employees' paychecks. In sharp contrast to these kinds of policies, however, plaintiffs assert that Sprint intentionally treated younger employees more favorably than older employees during the RIF by, for example, transferring younger employees to "safe" positions before and during the RIF; exempting younger employees from the RIF; transferring older employees to positions and departments scheduled to be phased out or eliminated in the RIF; filling "open" positions with younger employees just prior to the RIF and then terminating older employees in the same or similar positions during the RIF; providing spreadsheets containing age-related criteria to managers for use in connection with RIF-related termination decisions; failing to give the same consideration to older employees seeking to reapply for open positions; and denying older employees the opportunity to interview for open positions. Each of the policies and practices identified by plaintiffs, then, involves the intentional differential treatment of similarly situated employees which, by definition, is a facially discriminatory action. *See Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1500-1501 (10th Cir. 1995) (facially discriminatory actions involve

---

[1] The only difference is that the "blocker" policy was, to the extent that individuals were expressly identified on employee lists as "blockers," in written form. None of the policies and practices challenged by plaintiffs here appear to be written. To the extent, as Sprint suggests, that an unwritten policy or practice can nonetheless be "facially" discriminatory or neutral, those identified by plaintiffs here are facially discriminatory.

differential treatment of similarly situated persons or groups); *accord EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1282 (11th Cir. 2000) (restaurant's hiring system was facially discriminatory rather than facially neutral where restaurant had a desired preference for male food servers and that preference influenced hiring decisions); *cf. Maldonado v. City of Altus*, 433 F.3d 1294, 1303 (10th Cir. 2006) (employment practice is facially neutral if it is neutral in its treatment of different groups).[2]

Sprint also contends that the number of individual plaintiffs terminated as a direct result of each allegedly discriminatory policy or practice is "highly relevant" to the presumption that plaintiffs will seek to use in the second phase of this case. As Sprint argues, if a certain practice only affected 3 plaintiffs, then a presumption that it affected 1400 other plaintiffs would be inappropriate. Sprint's argument, however, ignores the fact that plaintiffs will be entitled to a presumption of discrimination only if they prove to the jury that Sprint engaged in a pattern and practice of discrimination–that discrimination was Sprint's "standard operating procedure." *Teamsters*, 431 U.S. at 336. To be sure, no reasonable jury could find that discrimination was Sprint's standard operating procedure based on evidence demonstrating that 3 individuals were subjected to discriminatory practices. That said, plaintiffs can prove that Sprint engaged in a pattern and practice of discrimination without proving–or even arguing–that specific individual

---

[2]The one exception is plaintiffs' reliance on Sprint's use of the "alpha" performance rating system. With respect to this practice, plaintiffs contend that Sprint intentionally adopted and used this system for the purpose of discriminating against older workers (a facially discriminatory practice) and that, to the extent Sprint innocently adopted the rating system, the system had a disparate impact on older workers (a facially neutral practice).

8

plaintiffs were subjected to specific discriminatory practices.

The court understands that plaintiffs intend to prove a pattern and practice of discrimination in large part through an expert witness (or expert witnesses) who presumably will testify that the data for the RIF which affected plaintiffs shows statistically significant disparities based on age. This approach is consistent with the approach taken in the vast majority of pattern and practice cases, *see Robinson v. Metro- North Commuter R.R. Co.*, 267 F.3d 147, 168 (2d Cir. 2001) (first phase or "liability" phase of pattern and practice trial is "largely preoccupied" with statistical evidence directed at establishing an overall pattern or practice of intentional discrimination); *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1228 (11th Cir. 2001) (while absence of statistical evidence was not "necessarily fatal" to plaintiffs' claims, case should not have been allowed to proceed as a pattern and practice case where plaintiffs presented only vague allegations of a policy of forcing out older workers), and is the approach that the court, absent any "smoking gun" evidence, would expect in a case involving a reduction in force affecting thousands of people. *Compare In re Western Dist. Xerox Litigation*, 850 F. Supp. 1079 (W.D.N.Y. 1994) (in case involving RIF of more than 18,000 people, "absent some established corporate policy or admissions of corporate executives, statistical evidence would seem to be the *sine qua non* for this type of action.") *with Pitre v. Western Elec. Co.*, 843 F.2d 1262, 1268 (10th Cir. 1988) (suggesting that the use of statistical evidence in a pattern and practice case may not be as significant where the overall number of employees is small). Indeed, plaintiffs may be able to establish a prima facie case of discrimination based on statistics alone–without anecdotal evidence of specific instances of discrimination–if the statistics reveal a "gross disparity" in the

treatment of employees based on age. *Robinson*, 267 F.3d at 158. As the Supreme Court recognized in *Teamsters*, the use of statistics is often "the only available avenue of proof" to "uncover clandestine and covert discrimination" by an employer:

> Statistics showing racial or ethnic imbalance are probative in a case such as this one only because such imbalance is often a telltale sign of purposeful discrimination; absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired. Evidence of longlasting and gross disparity between the composition of a work force and that of the general population thus may be significant.

431 U.S. at 340 n.20.

The court understands, however, that plaintiffs will seek to buttress their statistical evidence with anecdotal evidence of discrimination. Again, this approach is consistent with the approach followed in most pattern and practice cases. *See Robinson*, 267 F.3d at 158; *Pitre*, 843 F.2d at 1267; *King v. General Elec. Co.*, 960 F.2d 617, 624 (7th Cir. 1992) (collecting cases). However, to the extent that evidence regarding specific instances of alleged discrimination is relevant during the liability stage, it simply provides "texture" to the statistics. *Robinson*, 267 F.3d at 168. Such anecdotal evidence is not introduced to establish that the particular instances of discrimination actually occurred nor that the particular employees were in fact victims of discrimination. *Id.* (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-45 n. 10 (1989)). Thus, under plaintiffs' intended approach–a combination of statistics and anecdotal evidence–plaintiffs will not be required to link the termination of each individual plaintiff–or any plaintiff for that matter–to a specific discriminatory practice and, to that extent, defendant's

10

Interrogatory No. 2 is not relevant.

The court turns, then, to consider what type of evidence it will expect defendant to present in response to plaintiff's evidence at the first phase trial. If plaintiffs are able to present evidence sufficient to establish a prima facie case of discrimination, the burden of production shifts to Sprint to show that plaintiffs' proof is either inaccurate or insignificant. *Teamsters*, 431 U.S. at 360. With respect to plaintiffs' statistical proof, several "basic avenues of attack" are available to Sprint to challenge those statistics, namely assault on the source, accuracy, or probative force:

> The defendant can present its own statistical summary treatment of the protected class and try to convince the fact finder that these numbers present a more accurate, complete, or relevant picture than the plaintiff[s]' statistical showing. Or the defendant can present anecdotal and other non-statistical evidence tending to rebut the inference of discrimination. The prudent defendant will follow all three routes if possible, presenting its own version of the numbers game, attempting to undermine the plaintiff[s]' version with specific attacks on [the] validity of the plaintiff[s]' statistics, and garnering non-statistical evidentiary support as well.

*See Robinson*, 267 F.3d at 159 (quotation omitted). While an argument could be made that Sprint might be able to use the information provided in response to Interrogatory No. 2 to rebut the accuracy or significance of plaintiffs' statistics (e.g., the statistics are inaccurate and cannot show a "standard operating procedure" because plaintiffs themselves admit that only 7 plaintiffs were subjected to this practice; only 13 were subjected to this other practice; many were subjected to only one practice), the court would not permit Sprint to make such an argument at trial for two reasons.

First, plaintiffs' theory is that Sprint intentionally treated older workers less favorably

11

than younger workers in connection with its RIF-related termination decisions and that this discrimination was implemented through various practices, from reassignment and transfer decisions to rehiring decisions. Such a theory seems entirely permissible, *see Teamsters*, 431 U.S. at 335 (government's theory was that employer regularly treated African-American and Spanish-surnamed Americans less favorably than white persons and that the disparity in treatment involved the refusal to recruit, hire, transfer or promote minority group members on an equal basis with white members), and the fact that certain practices may have been utilized more often than others or were not used as to a given individual or individual would not indicate that no pattern of discrimination existed assuming the cumulative decisionmaking evidenced such a pattern. Second, Sprint, in presenting its defense, will be expected to respond to plaintiffs' prima facie case. *See id.* at 360 n.46. In other words, because plaintiffs' case is limited to evidence concerning a pattern of discriminatory decisionmaking (as opposed to evidence concerning individual termination decisions) and plaintiffs' proof will rely in large part on statistics showing the expected result of a regularly followed discriminatory policy, Sprint's burden is to provide a nondiscriminatory explanation for the apparently discriminatory result, not to examine the discrete decisions of which the result is composed. *Id.*; *accord Williams v. Boeing Co.*, 225 F.R.D. 626, 634 (W.D. Wash. 2005) ("Because plaintiffs need not prove that each member of the class was a victim of the discriminatory policy and instead present evidence applicable to the class as a whole, defendant's rebuttal should likewise focus on class-wide evidence, not on individual employment decisions.").

Defendant's response to plaintiff's anecdotal evidence will turn on the nature of the

12

anecdotal evidence that plaintiff seeks to present. As reflected in both *Teamsters* and the Tenth Circuit's decision in *EEOC v. Sandia Corp.*, 639 F.2d 600 (10th Cir. 1980), the most effective and appropriate anecdotal evidence, to the extent available, is evidence concerning the employer's allegedly discriminatory practices. For example, in *Sandia Corp.*, the plaintiffs supplemented their statistical evidence by calling a number of Sandia's supervisors, who testified that management was concerned over the increasing average age of the corporation's employees and that concern caused it to use various methods to encourage older employees to volunteer for the reduction in force program. *See id.* at 608. Another manager testified that he was told to consider three criteria in nominating employees for termination: elimination of jobs, job performance and the likelihood of personnel taking advantage of the early retirement program. *See id.*

Similarly, in *Teamsters*, the government bolstered its statistical evidence with the testimony of individuals who recounted specific instances of discrimination. One individual, an African-American, testified that when he expressed interest in line driving, the terminal manager replied that he did not feel that the company was "ready" for that right now and that there would be "a lot of problems on the road with different people, Caucasian, et cetera." 431 U.S. at 338. Another testified that when he applied for a line driver job, he was told that he "had one strike against him": "You're a Chicano, and as far as we know, there isn't a Chicano driver in the system." *Id.*

If plaintiffs in this case are able to use anecdotal evidence specifically tied to defendant's allegedly discriminatory practices (e.g., admissions from management personnel or evidence of

13

established corporate policy as opposed to evidence from employees who simply testify that they were older and suffered adverse employment actions), then defendants will not be permitted to respond with individualized evidence that discrete decisions were motivated by legitimate nondiscriminatory reasons and will be able to meet its burden by showing that such a practice did not exist. In showing that such a practice did not exist, however, defendant will not be permitted, for the reasons explained above, *see supra* p. 12, to present evidence demonstrating which of 1700 plaintiffs were or were not subjected to one or more particular discriminatory practices and, thus, defendant's Interrogatory No. 2 seeks discovery that is not relevant. In contrast, if plaintiffs seek to supplement their statistics with testimony from individuals who offer little more than "I was over 40 and was selected for layoff," then the door is left open for defendant, with respect to that witness, to explain why the discrete decision was made. Even under these circumstances, however, evidence that a particular plaintiff was or was not subjected to a particular discriminatory practice would not be pertinent when all plaintiffs assert that they were subjected to at least one discriminatory practice as part of an overarching policy of age discrimination.[3]

Having concluded that Sprint's interrogatory seeks information that is irrelevant to the first phase trial, the court turns to consider whether that interrogatory might nonetheless seek information that is relevant to Sprint's anticipated motion for decertification. According to

---

[3]While the court need not make any definitive rulings today regarding the quantity of anecdotal evidence it will permit at trial, the court anticipates that, upon consultation with the parties, it will limit the anecdotal evidence as it deems appropriate to ensure that the liability phase remains manageable. *Robinson,* 267 F.3d at 168 (citing Fed. R. Evid. 403).

Sprint, discovery concerning whether individual plaintiffs have been subjected to a "common impact" is critical to its upcoming motion and, more specifically, its argument that plaintiffs in this case are not similarly situated. Sprint asserts that the Circuit in *Thiessen* concluded that those plaintiffs were similarly situated because they were all subjected to "a common impact from the blocker policy" and Sprint believes that the information it seeks in Interrogatory No. 2 will demonstrate that these plaintiffs, having suffered no common impact, are not similarly situated.

While it is not entirely clear what Sprint means by use of the phrase "common impact,"[4] (a phrase not utilized by the Circuit in *Thiessen*), the *Thiessen* court concluded that the plaintiffs were similarly situated because all plaintiffs were subjected to adverse (though diverse) employment actions during the relevant time period, some of whom had been specifically

---

[4] Sprint asserts that when the class is not subject to "common impact," courts have held that the plaintiffs making up the class are not similarly situated. In support of this assertion, Sprint directs the court only to *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207 (5th Cir. 1995), where, according to Sprint, the Circuit affirmed the district court's decertification of the class because the "impact of Aramco's policies on the class varied significantly." Specifically, the district court decertified the class in large part because the class members alleged widely varying circumstances surrounding their terminations, including discriminatory selection for RIF, forced retirement, refusal to transfer to other departments and retaliatory refusal to rehire. *See id.* at 1214-15. To the extent Sprint's reading of *Mooney* is correct–that the Circuit affirmed the decision that the plaintiffs were not similarly situated because the policy did not have a "common impact" on the member of the class–this court is confident that the Tenth Circuit, as evidenced in *Thiessen*, would not agree with the Fifth Circuit's analysis. Significantly, the plaintiffs in *Thiessen* did not suffer a "common impact" from the blocker policy–their claims spanned nearly 10 years and ranged from discriminatory layoff, constructive discharge and discriminatory failure-to-promote to discriminatory downgraded performance evaluations and discriminatory failure-to-train–yet the Circuit determined those plaintiffs were similarly situated.

identified as "blockers" and the rest of whom fell within the alleged definition of a "blocker." 267 F.3d at 1107-08.  Central to the Circuit's conclusion that the plaintiffs were similarly situated, however, was the fact that the plaintiffs were alleging a pattern and practice of discrimination and that the defendant–through the blocker policy and the MDP–implemented a company-wide policy of age discrimination.  *See id.* at 1105, 1107-08.

Like *Thiessen*, the plaintiffs here all allegedly suffered adverse employment actions during the relevant time period (unlike *Thiessen*, all plaintiffs here allegedly suffered the same adverse action, termination of employment) and all assert that they were terminated as a result of an alleged company-wide policy of discrimination.  While the plaintiffs in *Thiessen* argued that the company-wide policy of discrimination was implemented in large part through a single, cohesive "blocker" policy, the plaintiffs here assert that the policy was implemented through various methods, including rehiring practices and reassignment practices.  As the court reads *Thiessen*, however, the fact that the plaintiffs pointed to a single, cohesive "blocker" policy was not significant to the court's conclusion that the plaintiffs were similarly situated.  What was significant was that the plaintiffs all asserted that they had been the victims of a company-wide policy of age discrimination (a policy that happened to have been implemented in large part through the blocker system), they presented sufficient evidence of that company-wide policy to have a jury decide whether such a policy existed and none of the other factors pertinent to the similarly situated issue (whether individual issues would predominate and trial management considerations) weighed against certification.  Thus, the fact that individual plaintiffs in this case, each of whom alleges that he or she was a victim of a company-wide practice of

discrimination and that such discrimination was Sprint's standard operating procedure, may have been subjected to that overarching policy through different techniques does not appear pertinent to the similarly situated issue.

For the foregoing reasons, the court grants plaintiffs' motion to review and sustains their objection to the magistrate judge's order compelling them to respond to defendant's Fourth Interrogatory No. 2.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' motion for review (doc. 4196) is granted and their objection to the magistrate judge's March 21, 2006 order compelling plaintiffs to respond to defendant's Fourth Interrogatory No. 2 is sustained.

**IT IS SO ORDERED.**

Dated this __3rd____ day of August, 2006, at Kansas City, Kansas.

                                              _s/John W. Lungstrum_____
                                              John W. Lungstrum
                                              United States District Judge