## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Shirley Williams et al.,**

        **Plaintiffs,**

**v.**                                            **Case No. 03-2200-JWL**

**Sprint/United Management Company,**

        **Defendant.**

## <u>MEMORANDUM & ORDER</u>

Plaintiff Shirley Williams filed this suit on behalf of herself and others similarly situated asserting that her age was a determining factor in defendant's decision to terminate her employment during a reduction-in-force (RIF). This case has been provisionally certified as a collective action pursuant to 29 U.S.C. § 216(b).

This matter is presently before the court on that portion of plaintiffs' motions to review (docs. 3605 and 4338) that the court retained under advisement in its November 9, 2006 memorandum and order; specifically, whether defendant waived the attorney-client privilege by asserting its "good faith" compliance with the ADEA. As will be explained, the court now denies that portion of plaintiffs' motions and concludes that defendant has not waived the privilege by asserting its good faith compliance with the ADEA.

## I.  Background

Plaintiffs' motions to review challenged several orders issued by the magistrate judge in

which he concluded that certain documents relating to adverse impact analyses conducted by defendant are protected from discovery by the attorney-client privilege.[1]  Specifically, the magistrate judge concluded that the adverse impact documents constituted communications made for the purpose of obtaining legal advice and at the direction of counsel, that the documents were kept confidential and that defendant had not waived the privilege in any respect.  In their motions to review, plaintiffs asserted, among other things, that the magistrate judge erred in concluding that defendant had not waived the privilege by asserting its "good faith" compliance with the ADEA.

On November 9, 2006, this court issued its memorandum and order concerning plaintiffs' motions to review.  The court denied the motions to review in all but two respects–the court remanded to the magistrate judge the issue of whether defendant waived the attorney-client privilege with respect to certain documents for which defendant, on its privilege log, claimed only work product protection (that issue remains pending before the magistrate judge); and the court retained under advisement the issue of whether defendant's assertion that it had engaged in "good faith" efforts during the RIF process to comply with the ADEA was sufficient to require disclosure of the adverse impact documents.  With respect to that issue, the court explained that it could not discern on the record before it the facts on which defendant intended to base its assertion that it engaged in good faith efforts to comply with the ADEA and, thus, could not discern whether those facts would be sufficient to trigger a waiver of the privilege.

---

[1]For a more detailed explanation of the "adverse impact" issue in the context of this case, the reader is directed to this court's November 9, 2006 memorandum and order.

2

The court, then, held a telephone conference on November 16, 2006 to permit defendant

to explain (and plaintiffs to respond to that explanation) to the court the meaning of the phrase

"good faith" as that phrase is used in defendant's answer and to further explain to the court the

factual basis for defendant's "good faith" assertion.  Thereafter, the court directed the parties to

file supplemental briefs on the waiver issue.  That briefing is now complete and the issue is ripe

for the court's resolution.[2]


## II.    Discussion

Plaintiffs urge that defendant's assertion that it engaged in "good faith" efforts during the

---

[2]In their supplemental brief, defendant challenges certain statements that it believes
the court made during the November 16, 2006 telephone conference with the parties.
Specifically, defendant asserts that the court indicated that a party may assert the attorney-
client privilege for only two reasons–to simply vindicate the privilege for its own sake or to
hide misdeeds–and that the court suggested that it believed that defendant was asserting the
privilege to hide its misdeeds.  Defendant insists that the court's underlying premise is
"foreign to American law" and that the privilege exists to encourage clients to approach
lawyers for advice and thereby prevent problems and further objects to the court's
"acceptance" of plaintiffs' argument that defendant has engaged in misdeeds.

The court has reviewed the transcript from the hearing and finds that defendant's
recollection of the court's comments is inaccurate.  In fact, the court stated that "there are a
number of reasons for a party to vigorously assert the attorney-client privilege" and
proceeded to identify only two of those reasons–vindicating the privilege itself and protecting
from disclosure information that is harmful to the party asserting the privilege.  In
highlighting the "hiding misdeeds" rationale, the court did not mean to suggest that it
believed that defendant was hiding misdeeds.  Rather, the court expressly stated that it was
drawing that inference only for purposes of the discussion–a discussion in which the court
asked a series of pointed questions to defendant's counsel concerning defendant's "good
faith" defense based on what the court perceived as *plaintiffs' arguments and evidence*
concerning the waiver issue.

RIF process to comply with the ADEA is sufficient to require disclosure of documents reflecting adverse impact analyses conducted by defendant.  As explained by defendant, it asserted its "good faith" in its answer to plaintiffs' revised second amended complaint only to negate plaintiffs' claims that defendant committed willful violations of the ADEA.[3]  Defendant asserts that it does not intend to rely on the adverse impact analyses or the advice of counsel in support of its "good faith" defense.  Rather, defendant intends to rely on its anti-discrimination policies, the training that its employees received concerning those anti-discrimination policies and certain "due diligence" conducted by its Human Resources managers in reviewing RIF selection decisions to ensure that those decisions were justified by legitimate, nondiscriminatory reasons.[4]

Plaintiffs argue that defendant's reliance on its anti-discrimination policies and the "due diligence" conducted by its Human Resources managers to prove defendant's good faith compliance are both sufficient to trigger a waiver of the privilege with respect to the adverse impact documents.  Plaintiffs further assert that the deposition testimony of defendant's witnesses during discovery concerning reliance on the advice of counsel is sufficient to trigger a waiver of the privilege concerning the adverse impact documents.

---

[3]Although defendant asserted its "good faith" compliance as an affirmative defense in its answer to plaintiffs' revised second amended complaint, the court has previously rejected plaintiffs' argument that defendant had automatically waived the privilege merely by asserting "good faith" in its answer. *See Frontier Refining Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 699-701 (10th Cir. 1998).

[4]In addition, defendant intends to rely on the candidate selection worksheets utilized during the RIF process, relevant information from its HRIS database and "reasonable factors other than age" that its management used making RIF selection decisions.  Plaintiffs do not assert that defendant's reliance on this evidence constitutes a waiver of the privilege.

4

In resolving the waiver issue, the court first examines the pertinent case law and then analyzes each of these specific categories of evidence with reference to that case law.[5]

A.    *Pertinent Legal Standards Concerning Waiver*

As explained by the Tenth Circuit in *Frontier Refining Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 699 (10th Cir. 1998), courts generally employ some version of one of three general approaches to determine whether a litigant has waived the attorney-client privilege.  The first of these approaches is the "automatic waiver" rule whereby a litigant waives the privilege upon the mere assertion of a claim, counterclaim, or affirmative defense that raises as an issue a matter to which otherwise privileged material is relevant.  This court, in its November 9, 2006

---

[5]In their most recent brief, plaintiffs contend that a ruling from the court that defendant has not waived the privilege (rendering "off limits" any reference at trial to the adverse impact analyses) could inhibit plaintiffs from introducing evidence of defendant's awareness of the EEOC's "eighty percent" or "four-fifths" rule, as that evidence loses context in the absence of evidence concerning adverse impact analyses.  The court declines to address at this juncture plaintiffs' intent to introduce evidence concerning defendant's knowledge of the four-fifths rule, as plaintiffs' argument does not bear on whether, in the first instance, defendant has waived the privilege due to its assertion of a good faith defense.

Similarly, plaintiffs raise two arguments concerning the use of expert testimony at trial.  First, plaintiffs state that defendant should not be able to have an expert testify about the results of his or her adverse impact testing (presumably showing that the results of those tests indicate that no discrimination occurred) when defendant, during the RIF itself, performed its own adverse impact testing allegedly showing that discrimination had occurred.  Second, plaintiffs contend that if plaintiffs' experts, in performing an adverse impact analysis on behalf of plaintiffs, perform a statistical analysis at the Vice President level and defendant criticizes plaintiffs' experts for that methodology, then plaintiffs should be able to show that defendant itself performed adverse impact analyses at the Vice President level during the RIF.  Again, as these arguments do not bear on the issue before the court today, the court declines to address the merits of these arguments at this juncture.

5

memorandum and order, concluded that the Circuit would reject this liberal approach to waiver. The "intermediate" approach to waiver provides that the privilege is waived "only when the material to be discovered is both relevant to the issues raised in the case and either vital or necessary to the opposing party's defense of the case." *Id.* (citing *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975). The final, more restrictive approach provides that the privilege is waived only if the litigant directly puts the attorney's advice at issue in the litigation. *Id.* at 699-700 (citing *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851 (3d Cir. 1994).

While the Tenth Circuit in *Frontier* did not need to choose between the intermediate and more restrictive approaches to waiver, this court has advised the parties (during the November 16, 2006 telephone conference) that it believes the Circuit would adopt the intermediate approach as applied by the court in *Hearn v. Rhay* in light of its tendency to eschew bright-line rules in favor of more flexible, balancing tests in the context of employment discrimination cases. Under the *Hearn* test, each of the following three conditions must exist to find waiver: (1) assertion of the privilege was the result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to its defense. *Id.* at 701 (quoting *Hearn*, 68 F.R.D. at 581). A court, then, should find that the party asserting a privilege has impliedly waived that privilege through his own affirmative conduct when the party "places information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would [be] manifestly unfair to the

6

opposing party." *Hearn*, 68 F.R.D. at 581.

B.      *Anti-Discrimination Policies*

During the November 16, 2006 telephone conference and in its supplemental briefing to the court, defendant has asserted that it will demonstrate its "good faith" compliance with the ADEA by reliance on its anti-discrimination policies and the training that its employees received concerning those anti-discrimination policies.  Plaintiffs contend that defendant's reliance on those policies is sufficient to waive the privilege with respect to adverse impact analyses because those policies contain express provisions concerning "disparate impact analysis" and the legal department's role in that analysis.[6]  According to plaintiffs, any contrary result would preclude plaintiffs from testing defendant's adherence to its anti-discrimination policies and defendant's asserted belief that its anti-discrimination policies were effective.  Defendant, in turn, argues that an employer does not waive the attorney-client privilege by merely incorporating a written "legal review" requirement into its RIF guidelines.  As explained below, the court concludes that

_____

[6]Plaintiffs also state that the adverse impact analyses are inextricably merged with the "intent" element of plaintiffs' claims because those analyses are the "only device by which Sprint's knowledge of unlawful discrimination might be *directly* proved."  The court rejects plaintiffs' suggestion that having an "intent" element as part of one's burden of proof is sufficient to waive the privilege if protected documents would assist in proving that element.  Otherwise, each and every discrimination claim "would pry open the privilege for [the plaintiff's] indulgence."  *See Ward v. Succession of Freeman*, 854 F.2d 780, 786-87 (5th Cir. 1988) (rejecting plaintiffs' argument that having scienter element as part of burden of proof in securities fraud case was sufficient for showing "good cause" for suspending the privilege under rule in litigation involving a corporation and its shareholders that shareholders may have access to otherwise privileged information upon a showing of good cause).

7

defendant has not waived the privilege by referencing "disparate impact" review or "legal review" in its anti-discrimination policies.[7]

Before analyzing the parties' argument, the court must ascertain the specific "anti-discrimination policies" upon which defendant intends to rely in support of its good faith defense. Defendant has not identified any particular policy and plaintiffs have submitted to the court a "small sample" of what they contend amounts to "hundreds of pages of . . . written policies and mandatory guidelines." Defendant's reference to "anti-discrimination policies" and the training employees received concerning those policies clearly implies an intent to rely on official statements of policy or procedure that have been adopted (formally or otherwise) by defendant. While the record reflects that defendant maintains general nondiscrimination policies and statements in the employment context, see Kissinger Depo. at 29 (Jan. 18, 2005) and 342-44 (Dec. 18, 2003),[8] none of those policies are before the court and plaintiffs do not suggest that

---

[7]In its initial brief to the court, defendant contends that the court should not consider plaintiffs' argument that defendant waived the privilege by expressly including in its policies a reference to "disparate impact" testing or "legal review." According to defendant, plaintiffs' argument was not presented in their initial motion to review and is thus inappropriately presented at this late stage. The court rejects this argument. While plaintiffs did not raise the specific issue of the contents of defendants' policies before the magistrate judge or in their motion to review, plaintiffs obviously raised the "waiver by assertion of good faith defense" argument and only through prompting by the court and supplemental briefing did the specific components of that defense–including defendant's reliance on its policies–become clear.

[8]All references to the "Kissinger" deposition refer to the 30(b)(6) deposition of James Kissinger, defendant's Senior Vice President of Human Resources, whom defendant designated as its representative to testify about the policies and procedures of defendant's human resources department.

defendant's reliance on those general policies would result in a waiver of the attorney-client privilege.  With respect to the specific context of a reduction in force, the record reflects that a document entitled "Workforce Reduction Guidelines" (referred to by the parties as Exhibit 8 and bearing Bates-stamp numbers SPR-W010960 et seq.) is the only written company-wide policy, practice or procedure concerning the implementation of a reduction in force.  See Kissinger Depo. at 345 (Dec. 18, 2003).  Defendant's Workforce Reduction Guidelines are distributed to defendant's Human Resources department for use in working with line managers to facilitate a reduction in force.  See Kissinger Depo. at 29 (Jan. 18, 2005).  The Workforce Reduction Guidelines are mandatory and the managers utilizing the guidelines are expected to follow the steps outlined in the guidelines.  See Kissinger Depo. at 35 (Dec. 17, 2003).  The Workforce Reduction Guidelines, then, appear to be the type of official policy adopted by defendant upon which defendant intends to rely to prove its good faith defense.[9]

The court cannot conclude that any other documents before it constitute the type of "policy" on which defendant intends to rely to support its good faith defense.  While plaintiffs have submitted numerous pages of documents that they summarily assert constitute "defendant's policies and procedures," the record does not support this conclusion.  The vast majority of the documents submitted by plaintiffs appear to be stray e-mails referencing "adverse impact" or the

_____

[9]The court need not resolve whether any portion of the Workforce Reduction Guidelines constitutes an "anti-discrimination policy" as defendant has not challenged plaintiffs' assertion that it does constitute such a policy.  Moreover, Mr. Kissinger testified that the Workforce Reduction Guidelines' express reference to "discrimination" on the "Planning Checklist" incorporates defendant's general policies prohibiting discrimination. See Kissinger Depo. at 29-30 (Jan. 18, 2005).

need for "legal review" of selection decisions.  In the context of the motion to review, however, the key is whether defendant has waived the privilege by its assertion of a "good faith" defense–a defense that it intends to prove by reliance on its anti-discrimination policies.  There is no indication that defendant is intending to rely on these e-mails to prove its good faith defense.  Rather, defendant is relying on its employees' knowledge of defendant's policies concerning nondiscrimination and the effectiveness of those policies.  Even under the most liberal definition, the e-mails and other documents submitted by plaintiffs do not constitute "anti-discrimination policies."

The court turns back, then, to the Workforce Reduction Guidelines.  For purposes of the waiver issue, only two pages of that multi-page document are pertinent.  The second page of the Guidelines is entitled "Planning Checklist" and it lists a "number of topics, issues, or actions that may be relevant in planning a workforce reduction depending on the circumstances."  The document then lists via bullet points fifteen (15) topics or issues, including topics such as "placement to avoid reduction," "advance notice, timing and coordination of notification," and "confidentiality."  The fourth topic on the list is "Discrimination or Disparate Impact," and the ninth topic on the list is "Coordination with Law Department."  The third page of the Guidelines is entitled "Displacement Guidelines" and it sets forth "guidelines for selecting employees for reduction . . . in descending order of importance."  This page directs the recipient, when reviewing "same site multiple job incumbents" to "formally consider" the qualifications of each incumbent;  recent performance ratings, attendance, total contribution, critical skill sets and knowledge of each incumbent; any corrective action notices or warnings; and length of service

within the company and within the position.  The recipient is then directed to "review planned displacement action with the Law Department and Corporate Employee Relations in advance for disparate impact analysis."[10]

The court concludes that the mere fact that the Workforce Reduction Guidelines contain express provisions concerning "disparate impact" and coordination or counseling with defendant's legal department is insufficient to trigger a waiver of the privilege with respect to the adverse impact analyses.  The court does not dispute plaintiffs' argument that defendant's adverse impact analyses and its consultation with counsel are relevant to the overall effectiveness of the Workforce Reduction Guidelines; indeed, those concepts are expressly contained in the Guidelines themselves.[11]  As suggested by the Tenth Circuit in *Frontier*, however, the mere fact that privileged material is relevant to a matter that is raised as an issue in connection with the assertion of an affirmative defense is insufficient to trigger a waiver.  *See Frontier*, 136 F.3d at 699 ("automatic waiver" rule provides that a litigant "automatically waives the privilege upon

---

[10]Although the phrases "disparate impact" and "disparate impact analysis" are utilized in the Workforce Reduction Guidelines, there is no dispute that the phrase "disparate impact" is interchangeable with "adverse impact."  To avoid confusion and to be consistent with prior orders focusing on "adverse impact analyses," the court in this order uses only the phrase "adverse impact."

[11]Even if those concepts were not expressly contained in the Guidelines, adverse impact analyses and consultation with counsel would nonetheless be pertinent to the issue of whether the Guidelines were effective if defendant otherwise required (though not in writing) its managers to consult with counsel about selection decisions.  Certainly, the court would not find a waiver in those circumstances and the court does not believe that the waiver analysis is altered by the mere fact the defendant elected to express that requirement in the Guidelines themselves.

11

assertion of . . . an affirmative defense that raises as an issue a matter to which otherwise privileged material is relevant"). In other words, the mere fact that the Guidelines expressly require consultation with counsel or adverse impact testing, standing alone, should not trigger a waiver of the privilege. Rather, as explained in *Hearn*, the key is whether defendant will "assert the privilege in aid of" or "invoke the privilege in furtherance of" its argument that it complied in good faith with the ADEA in part because of the effectiveness of and its adherence to its anti-discrimination policies, including the Workforce Reduction Guidelines. *Hearn*, 68 F.R.D. at 581.

Defendant urges that it will not assert the privilege in furtherance of its good faith defense in the sense that it will not rely on any evidence which would cause it to open the door to an inquiry from plaintiffs which would then, in turn, cause defendant to assert the privilege. According to defendant, it will tout its good faith compliance with the ADEA and the effectiveness of its policies without reference to the adverse impact analyses and without reference to consultation with counsel. Instead, it will focus solely on the remaining aspects of the Workforce Reduction Guidelines and other anti-discrimination policies, including requirements that managers consider factors such as performance ratings, attendance, knowledge and experience, length of service and corrective action notices. In other words, defendant will not attempt to prove its good faith, tout the effectiveness of its policies, or otherwise justify any selection decisions by relying on advice of counsel or the results or performance of any adverse impact analyses; it will defend its selection decisions based on grounds wholly separate from advice of counsel and adverse impact testing. In such circumstances, the court believes that

12

defendant may rely on its adherence to and the effectiveness of its policies, including the Workforce Reduction Guidelines, without requiring an examination of the adverse impact analyses or otherwise protected communications.  The privilege, then, has not been waived.  *See Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1552 (10th Cir. 1995) (no waiver of privilege where defendant did not justify termination decision on the basis of advice of counsel and did not claim that termination was based on recommendation from counsel).

In keeping with its assertion that it does not intend to rely on any adverse impact analyses or consultation with counsel in discussing its anti-discrimination policies or the Workforce Reduction Guidelines, defendant suggests that the references to "disparate impact" and coordination or counseling with the legal department be redacted from the Workforce Reduction Guidelines and that plaintiffs be prohibited from inquiring about whether defendant's managers consulted with counsel in implementing the reduction in force and whether those managers were advised about the results of any adverse impact analyses.  The court is persuaded that this approach is an appropriate one.  While plaintiffs contend that the documents should not be redacted and that, in the absence of a waiver finding, they should be permitted to introduce evidence that adverse impact analyses were required by the Workforce Reduction Guidelines but defendant should be prohibited from introducing evidence that those analyses were performed, leaving the jury with the inference that defendant did not adhere to its policy.  This is not a reasonable solution to the issue.  Because the court has concluded that defendant has not waived the privilege by including express provisions in its policy concerning adverse impact analyses and the need for legal review, it would be inappropriate to permit plaintiffs to inquire about such

13

testing and then force defendant to either invoke the privilege in the jury's presence (creating the negative inference desired by plaintiffs) or waive the privilege by responding to the question. *See Nabisco, Inc. v. PF Brands, Inc*., 191 F.3d 208, 225-56 (2d Cir. 1999) ("[W]e know of no precedent supporting [an adverse] inference based on the invocation of the attorney-client privilege."), *overruled on other grounds sub nom. Moseley v. Secret Catalogue*, 537 U.S. 418 (2003).

Plaintiffs also contend that the redaction approach suggested by defendant creates additional problems because then the Workforce Reduction Guidelines are left devoid of any reference for the need to avoid discrimination in selection decisions, prompting plaintiffs to highlight for the jury that defendant's Workforce Reduction Guidelines do not even address the topic of discrimination. The court rejects this argument as well. Redaction of the phrase "disparate impact" still leaves a reference to "discrimination" on the Planning Checklist page of the Guidelines and it is this reference to "discrimination" that Mr. Kissinger testified was intended to incorporate into the Guidelines defendant's general nondiscrimination policies. Plaintiffs, then, would not be able to suggest that the Guidelines did not address the topic of discrimination. In any event, the court would not permit plaintiffs to leave the inference with the jury that provisions of the Workforce Reduction Guidelines that had been redacted on the basis of privilege did not exist in the first instance.

For the foregoing reasons, the court concludes that defendant has not waived the privilege with respect to adverse impact analyses by referencing "disparate impact" review or "legal review" in its Workforce Reduction Guidelines.

14

C.      *Due Diligence Conducted by Human Resources*

In its supplemental briefing, defendant also asserts that it will support its "good faith" defense with evidence concerning "the assistance of the Human Resources Department and its due diligence in reviewing [selection] decisions prior to obtaining any legal advice."   In response, plaintiffs urge that any due diligence conducted by Human Resources is inseparable from the due diligence conducted by or on behalf of defendant's legal department such that defendant's intent to rely on "due diligence" in any respect clearly waives the privilege with respect to the adverse impact documents.   Defendant, on the other hand, contends that the due diligence review conducted by Human Resources is distinct from the review conducted by defendant's legal department such that its reliance on the due diligence conducted by Human Resources leaves intact the privilege concerning adverse impact documents.   As explained below, the court concludes that defendant's intention to introduce evidence of human resources' due diligence review of selection decisions does not implicate the adverse impact analyses or any other privileged communication and that defendant has not waived the privilege by its reliance on the due diligence review conducted by human resources.

To begin, the record reflects a great deal of confusion on the part of both plaintiffs and defendant concerning the extent to which due diligence performed by Human Resources is separate from the review conducted by the legal department.   While each party vigorously blames the other for this confusion, it appears to the court that both parties have contributed to it.   Defendant, in much of its briefing throughout this case and through the testimony at the March 2006 evidentiary hearing before Magistrate Judge Waxse, maintained that the due

15

diligence conducted by Human Resources, at least through the time when the adverse impact documents were created by Human Resources, was a separate process from that conducted by the legal department. Plaintiffs, too, have evidenced a belief that these processes were separate and distinct. However, as reflected in much of the deposition testimony presented to the court by plaintiffs in connection with this motion and their motion to review the magistrate judge's order of October 5, 2006 granting defendant's motion for protective order prohibiting discovery relating to adverse impact analyses, defendant has objected on the basis of attorney-client privilege to questions posed by plaintiffs' counsel that appear designed to solicit information concerning this separate due diligence conducted by Human Resources. In large part, then, the issue has been confounded through the course of depositions in this case.[12]

In an effort to ascertain for itself whether the due diligence conducted by Human Resources is separate from any review conducted by or on behalf of the legal department, the court examines the evidence in the record before it. In that regard, the record reveals that the vast majority of defendant's witnesses have testified (that is, when they have been permitted by defendant's counsel to testify on the subject) that human resources conducted an initial "due

___

[12]Defendant contends that to the extent defendant's counsel improperly shielded deposition questions with a privilege objection, the fault lies with the "poor questioning" advanced by plaintiffs' counsel. While some of the questions asked by plaintiffs' counsel may have merged the concepts of "adverse impact" and "due diligence," certainly both parties (and witnesses) have used those phrases interchangeably at times. Moreover, defendant's counsel did not assist the deposition process by asserting a blanket privilege objection rather than clarifying for plaintiffs' counsel the distinction defendant was drawing between "adverse impact" and "due diligence" or attempting to sort out with plaintiffs' counsel the specific information sought from the deponent.

diligence" review (also referred to as a "sore thumb" review by certain witnesses) of selection decisions prior to obtaining legal advice. Similarly, virtually all of defendant's witnesses testified that the adverse impact documents were not utilized by human resources in any fashion and that those documents were generated by Human Resources for the sole purpose of transmitting the documents to the legal department.

The most thorough explanation of the due diligence conducted by Human Resources is found in the testimony given by Deb Sprayberry at the March 2006 evidentiary hearing before Magistrate Judge Waxse. During the time period relevant to this lawsuit, Ms. Sprayberry was employed as defendant's Manager of Regional HR Operations responsible for supporting HR managers in the field (managers who, in turn, supported the sales organization and retail stores). As part of her job, Ms. Sprayberry was responsible for guiding field HR managers though the reduction in force process. As explained by Ms. Sprayberry, human resources would conduct a "preliminary HR review" prior to any contact with the legal department and prior to the generation of any adverse impact documents. This review constituted a "quick" review of the selection decisions by reviewing the candidate selection worksheets (also referred to as "realignment selection worksheets")–worksheets containing the names of the individuals selected for termination and reflecting how those individuals were evaluated against specific selection criteria. These worksheets were not part of the adverse impact documents and, in fact, the initial HR review, as explained by Ms. Sprayberry, occurred before the adverse impact documents were created. According to Ms. Sprayberry, human resources, in conducting their initial review, did not review any summary data and only examined the "raw data" to see if

"there was something that was very obvious that we needed to address." Ms. Sprayberry testified that each HR manager would have received candidate selection worksheets from the field and that any initial HR review would have been based on these worksheets. In summary, Ms. Sprayberry testified that the initial HR review was completely separate from the adverse impact process involving the legal department.

Ms. Sprayberry's testimony is consistent with the testimony of other Human Resources employees. For example, Michael Brill, a manager in defendant's human resources department, testified that the organizations that he supported would provide to him candidate selection worksheets and he would use those worksheets to "perform initial due diligence before we would partner with legal on final adverse impact." According to Mr. Brill, human resources would review the candidate selection worksheets to "determine were there any decisions that look like they were inappropriate decisions." James Kissinger, previously a Vice President for Human Resources, testified that Human Resources frequently conducted a "sore thumb" review of selection decisions prior to obtaining legal advice. According to Mr. Kissinger, this review "stopped short of the official adverse impact analysis that's required and required and directed by the law department" and typically consisted of an "overall observation of the number of minority employees subject to reduction." Mr. Kissinger testified that this review simply looked for "obvious issues" and that it did not involve statistical adverse impact analysis in the sense that was required by the legal department.

In addition, the testimony of numerous witnesses confirms that Human Resources did not utilize the adverse impact analyses in conducting their own due diligence review (or in any

respect, for that matter).  At the March 2006 evidentiary hearing before Magistrate Judge Waxse, each witness who testified on behalf of defendant (i.e., Scott Winkler; James Kissinger; Deb Sprayberry; Gina Eisler; and Eric Rice) testified that Human Resources' only involvement with the adverse impact analyses was to input the pertinent data in the computer (the computer then generated the adverse impact calculations and the matrix) and then forward the resulting document to the legal department.   Without exception, these witnesses testified that Human Resources did not utilize the adverse impact documents for any reason independent of the legal review conducted by the legal department.

While plaintiffs acknowledge the testimony of these witnesses, they assert that two other Human Resources employees–Marvin Motley and John Shannon–have testified that the due diligence conducted by Human Resources involved reviewing the same adverse impact documents that were ultimately sent to legal, thus rendering the two processes inextricably intertwined. While Mr. Motley's deposition testimony is not a model of clarity (due in part to plaintiffs' counsel's use interchangeably of the phrases "adverse impact review" and "due diligence review"), the court does not view that testimony as inconsistent with the testimony of other human resources employees.  Mr. Motley testified that in terms of any "adverse impact analysis," the role of human resources was simply to collect the pertinent data and pass that information on to the legal department for a determination of whether any adverse impact existed.  Mr. Motley further testified that human resources, prior to any involvement with the legal department, would have conducted a "front end" or "sore thumb" analysis.  According to Mr. Motley, this review consisted of looking "at the information about what the total population

looked like and who was being separated to try to at least get a feel for whether we thought there was a problem or not."   Consistent with Ms. Sprayberry's testimony, then, this testimony indicates that human resources did not review any summary information or percentages and only looked at the raw data for obvious problems or glaring inconsistencies.  After plaintiffs' counsel inquires about the specifics of "how" human resources would perform its "front end" analysis, the following exchange takes place:

> Mr. Motley:   I think that they would have looked to see what the relative age of the people that are being separated compared to the population that they came from.  And the example that I would give you is if we saw a situation where the population was generally fairly–the majority of the population was over 40, you would expect the majority of the separated employees to be over 40.
>
> Counsel:   So did you gather statistics to try to determine whether or not the majority of [the] population was over 40?
>
> Mr. Motley:   I think they would have done basically, as I said before, sort of sore thumb and they would have passed off their data to do the specific analysis to the law department.
>
> Counsel:   Sure. Were there any documents generated with regard for the front end analysis by the HR?
>
> Mr. Motley:   Maybe not.
>
> Counsel:   Maybe so?
>
> Mr. Motley:   More likely not.  I mean, they would have used, we would have used the same forms that we passed on to the legal folks.  But I mean, we collect the data, we're going to look at it.

It is apparently Mr. Motley's testimony concerning human resources' use of the "same forms" that were sent to legal from which plaintiffs infer that human resources employees used the

adverse impact analyses in conducting their own due diligence or sore thumb review.

The court, however, declines to draw such a sweeping inference from this isolated portion of Mr. Motley's testimony, particularly as Mr. Motley does not ever state that human resources used the adverse impact documents in connection with its own due diligence.  Indeed, it is more probable that this portion of Mr. Motley's deposition references either the Master and RIF lists (spreadsheets generated by human resources indicating respectively the universe of employees in a particular pool and the individuals selected for termination from that particular pool) or the candidate selection worksheets about which other human resources employees testified.  This reading of this portion of Mr. Motley's testimony is more consistent with the entirety of Mr. Motley's testimony concerning the due diligence review.  In that regard, Mr. Motley consistently testified that, in his recollection, the human resources review consisted of looking "at the age of the people who were being separated" and "the pool of the people that they came from" to determine whether "an anomaly" existed.  The Master and RIF lists–documents that were ultimately sent to legal but are not protected by the privilege–contain the very data that human resources collected and from which human resources could have performed its "front end" analysis as described by Mr. Motley.  Similarly, to the extent that candidate selection worksheets were transmitted to the legal department, those documents would have been collected by human resources and examined by human resources in its initial due diligence review.  For the foregoing reasons, then, the court cannot conclude that Mr. Motley's deposition testimony supports plaintiffs' assertion that human resources utilized the adverse impact documents in performing its own due diligence of selection decisions.

With respect to Human Resources employee John Shannon, plaintiffs are correct that Mr. Shannon testified that he utilized the adverse impact analyses in performing his own due diligence review of selection decisions.  Mr. Shannon concedes, however, that he was "running [his] own adverse impacts outside of the policy" and that his conduct in utilizing adverse impact analyses in performing due diligence was "outside the sanction of our legal department."[13]  Thus, while the record reflects that Mr. Shannon was utilizing adverse impact analyses, the record also reflects that Mr. Shannon knew he was not authorized to do so and that his conduct was contrary to corporate policy.   In fact, Mr. Shannon's testimony otherwise supports the conclusion that HR due diligence consisted primarily of reviewing the candidate selection worksheets for obvious issues.  In that regard, Mr. Shannon testified that human resources would receive candidate selection worksheets from managers in the field and the human resources employees would "dig into" the worksheets to ascertain whether the selection decisions appeared to be supported by reason and logic and to seek clarification or additional information concerning selections decisions in advance of any input from the legal department.  Mr. Shannon's testimony, then, does not persuade the court that the "HR due diligence review" on which defendant intends to rely at trial involved a review of adverse impact documents that were sent to legal.

---

[13]The record reflects that defendant has produced documents relevant to Mr. Shannon's "own" adverse impact analyses and that defendant has permitted Mr. Shannon to testify on the subject.  In other words, defendant is not asserting the attorney-client privilege with respect to adverse impact analyses conducted by Mr. Shannon that were not done at the direction of the legal department.

Finally, plaintiffs contend that defendant's refusal to permit their witnesses to answer deposition questions (through the assertion of a privilege objection) concerning HR's due diligence review demonstrates that the HR due diligence review is inextricably intertwined with the review conducted by the legal department.  The court, however, is unwilling to draw this conclusion based solely on the deposition excerpts provided by plaintiff.  In many of the exchanges highlighted by plaintiffs' counsel in which privilege objections were lodged, plaintiffs' counsel had asked compound questions concerning both "adverse impact" and "due diligence" or had otherwise intermingled the two concepts.  In other words, there are very few pointed questions aimed solely at the separate due diligence conducted by human resources.  To make matters worse, defendant's counsel, on several occasions, was perhaps overreaching in its assertion of the privilege objection and failed to clarify that it did not object to questions aimed at the separate due diligence conducted by human resources.  Both parties, then, have contributed to a muddled deposition record on this issue and the court cannot conclude from those excerpts before it that defendant intended to use the privilege to shield questions seeking only information concerning the due diligence conducted by human resources.  To be clear, however, the court's ruling that defendant's reliance on the "separate" due diligence conducted by human resources has not waived the privilege is premised on defendant's representation that it will not lodge privilege objections to questions concerning that due diligence. If Magistrate Judge Waxse, in resolving plaintiffs' motion to compel responses to deposition questions, determines that any depositions need to be reopened to explore further the issue of HR's due diligence and defendant does not abandon its objections to questions concerning human resources' due diligence, then

the court will need to revisit the waiver issue entirely, as defendant's good faith defense is admittedly based in large part on the due diligence conducted by human resources.[14]

The court concludes, then, that defendant's intention to introduce evidence of human resources' due diligence review of selection decisions does not implicate the adverse impact analyses or any other privileged communication as the facts in the record concerning the due diligence review conducted by human resources demonstrate that the review did not utilize adverse impact analyses. In other words, the adverse impact analyses are not germane to the due diligence review conducted by human resources upon which defendant intends to rely. As such, defendant, through its reliance on human resources' due diligence review, has not put the adverse impact analyses or any other privileged communication at issue. Moreover, there is no manifest unfairness to plaintiffs in protecting the adverse impact analyses against disclosure as the adverse impact analyses were not part of human resources' due diligence review. In other words, plaintiffs are able to address fully defendant's evidence concerning human resources' due diligence review–a review that did not include utilization of the adverse impact analyses–without access to the adverse impact analyses.

For the foregoing reasons, the attorney-client privilege has not been waived by

---

[14]The court's ruling today is also premised on the fact that, as the record demonstrates today, John Shannon is the lone exception to the rule that human resources employees did not utilize adverse impact analyses in performing their own due diligence. If Magistrate Judge Waxse determines that depositions need to be reopened to explore the due diligence process further and plaintiffs discover that numerous other human resources employees were utilizing adverse impact analyses outside the sanction of the legal department, plaintiffs are not precluded from seeking appropriate relief from the court.

defendant's reliance on the due diligence review conducted by human resources.  *See Frontier Refining Inc. v. Gorman-Rupp Co.*, 136 F.3d 695 (10th Cir. 1998) (under middle-of-the-road approach to waiver, privilege is waived only when the material to be discovered is both relevant to the issues raised in the case and either vital or necessary to the opposing party's defense of the case); *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975) (privilege is waived when "the party asserting the privilege place[s] information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would [be] manifestly unfair to the opposing party").

D.      *Deposition Testimony of Defendant's Witnesses*

        Plaintiffs also contend that defendant's witnesses, contrary to defendant's counsel's insistence that defendant will not rely on an "advice of counsel" defense, have repeatedly testified that they relied upon defendant's legal department to advise them if any particular RIF selection decisions violated or appeared to violate anti-discrimination laws.  According to plaintiffs, an inference of nondiscrimination in favor of defendant then arises from the absence of testimony (due to defendant's invocation of the privilege) that the legal department ever indicated that any selection decisions raised red flags in terms of the pertinent discrimination laws.  Plaintiffs contend that this result is clearly impermissible under *Hearn* and its progeny, including *In re Broadcom Corp. Securities Litigation*, 2005 WL 1403516 (C.D. Cal. Feb. 10, 2005) and *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386 (11th Cir. 1994).

        Both *In re Broadcom Corp*. and *Cox* are distinguishable from the facts presented by

plaintiffs here.   In the first case, the individual defendants represented that they would affirmatively testify that each SEC filing and disclosure document was reviewed by counsel and that they expected counsel to advise them "if anything illegal was happening."   *In re Broadcom Corp.*, 2005 WL 1403516, at *2.   Similarly, in *Cox*, the defendant desired to affirmatively present evidence that it believed its conduct was legal.   17 F.3d at 1419.   By contrast, the deposition testimony relied upon by plaintiffs in this case shows, without exception, that the testimony concerning reliance on counsel was elicited by plaintiffs' counsel in response to pointed questions from plaintiffs' counsel concerning adverse  impact analyses–a subject that defendant has consistently urged is "off limits."   For example, one of defendant's executives, Michael Fuller, was asked by plaintiffs' counsel whether "any adverse impact analysis" was conducted with respect to a particular RIF and, in response, Mr. Fuller stated that he did not know, but that he "would expect the organization to inform [him] if any issues or problems were detected."   Another executive, Robert Dellinger, was asked by plaintiffs' counsel whether he was made aware of the results of adverse impact analyses; Mr. Dellinger replied that he believed he would be made aware if there was a specific issue in his organization.[15]

---

[15]Plaintiffs further contend that the testimony of defendant's witnesses reveals that the only information upon which those witnesses could have based their good faith belief that defendant was not violating the ADEA was the absence of any indication from defendant's legal department that problems existed with any selection decisions.  The court cannot accept this argument in light of the fact that the only testimony before the court stems from direct questions relating solely to adverse impact analyses or direct questions concerning whether the witness expected someone to advise him or her if problems existed with selection decisions.  The excerpts before the court do not reflect any questions concerning the factual basis for a witness' good faith belief that defendant's selection decisions complied with the ADEA.

The court finds no waiver in such circumstances.[16]  In so concluding, the court is guided in large part by the Fifth Circuit's decision in *Ward v. Succession of Freeman*, 854 F.2d 788 (5th Cir. 1988).  While the procedural posture of *Ward* is somewhat unique, the court nonetheless finds the opinion persuasive in the factual context presented here.  In *Ward*, a case brought by shareholders against a corporation alleging violations of securities laws, the district court had compelled defendants to disclose certain documents containing attorney-client communications based on a previous decision from the Fifth Circuit holding that shareholders, in litigation involving a corporation and its shareholders, may have access to otherwise privileged information after a showing of good cause.  *Ward*, 854 F.2d at 784.  The plaintiffs then used those documents in an attempt to establish the scienter element of their securities claims.  *See id.* at 786.  In an attempt to rebut these allegations, the defendants then sought to demonstrate their good faith reliance on the advice of counsel.  *See id.* at 788.  At that point, the district court, which had previously indicated that defendants had preserved their right to appeal the court's initial decision requiring disclosure of privileged communications, held that defendants had waived the privilege entirely by voluntarily injecting the advice-of-counsel issue into the case. *See id.* at 787.

On appeal, the Fifth Circuit reversed the district court's initial decision to compel disclosure of the attorney-client communications and also reversed the district court's decision

---

[16]Certainly, if defendant affirmatively and voluntarily injects the reliance on counsel issue at trial or in subsequent briefing to the court, the court will revisit the issue of whether defendant has waived the privilege.

that defendants thereafter waived the privilege by raising the advice-of-counsel issue.  According to the Fifth Circuit, the district court's finding of waiver did "not square with traditional notions of when a party acts voluntarily in introducing privileged matter so as to waive the privilege." *Id.*  Specifically, the Fifth Circuit emphasized that the defendants "never mentioned" the advice-of-counsel defense until after the district court compelled disclosure of privileged communications and only raised it at trial after the plaintiffs in the first instance introduced privileged communications concerning the advice of counsel. *Id.* at 788.  In such circumstances, the Circuit held that the defendants did not "voluntarily" inject the advice-of-counsel issue into the case but were merely rebutting an issue injected into the trial by plaintiffs:

> [Defendants were] not the first party to inject reliance on advice of counsel into the trial. The plaintiffs first argued that the advice given by [defendants'] attorneys to the defendants regarding disclosure decisions went straight to the crucial issue of whether the allegedly fraudulent decisions were made with scienter. [Defendants] had no choice but to negate the proof by showing it acted in good faith and without any knowledge of an evil plot to defraud shareholders. . . . [W]e do not see how [defendants] can be said to have waived its privilege when it was plaintiffs who exploited the attorney-client communications in order to attempt to prove their claims.

*Id.* at 789.

Similarly, the record before the court indicates that defendant's witnesses did not "voluntarily" raise the advice-of-counsel issue; they raised it only in response to direct questions from plaintiffs' counsel concerning privileged communications, including the adverse impact analyses and whether anyone had advised the witness about the results of such analyses.  Unlike *In re Broadcom Corp.* and *Cox*, then, the testimony of these witnesses does not indicate that defendant intends to use advice of counsel to justify any conduct on its part.  *See Motley v.*

28

*Marathon Oil Co.*, 71 F.3d 1547, 1552 (10th Cir. 1995) (no waiver of privilege where employer did not attempt to justify its decisions based on advice of counsel).  In other words, there is nothing in the record suggesting to the court that these witnesses (or any other witnesses on behalf of defendant) intend to, at their own initiative, testify at trial that they relied on counsel to advise them of any potential problems concerning RIF selection decisions.  Rather, the record reflects that, like the factual scenario in *Ward*, defendant's witnesses would feel compelled to testify about their reliance on counsel's advice only if plaintiffs, on cross-examination, were permitted to ask those witnesses about their knowledge of adverse impact analyses–a subject that has otherwise been deemed privileged.  As the court will not permit plaintiffs to inquire about privileged communications, defendant's witnesses will not testify about their reliance on counsel.

For the foregoing reasons, the court concludes that defendant has not waived the privilege by virtue of the deposition testimony of its witnesses.

**IT IS THEREFORE ORDERED BY THE COURT THAT** that portion of plaintiffs' motions for review (docs. 3605 and 4338) that the court previously retained under advisement are now denied.

**IT IS SO ORDERED.**

Dated this __8th____ day of December, 2006, at Kansas City, Kansas.

> __s/ John W. Lungstrum_____
> John W. Lungstrum
> United States District Judge